**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TUTOR PERINI BUILDING CORP., individually and, as to Count I of the Complaint, on behalf of all others similarly situated, pursuant to Article 3-A of the N.Y. Lien Law,<br><br>           Plaintiff,<br><br>    vs.<br><br>NEW YORK CITY REGIONAL CENTER, LLC; GEORGE WASHINGTON BRIDGE BUS STATION AND INFRASTRUCTURE DEVELOPMENT FUND, LLC; GSNMF SUB-CDE 12 LLC; GSB NMTC INVESTOR LLC: LIIF SUB-CDE XXVI, LLC; DVCI CDE XIII, LLC; GWB NMTC INVESTMENT FUND LLC; GWB LEVERAGE LENDER, LLC; GEORGE WASHINGTON BRIDGE BUS STATION AND INFRASTRUCTURE DEVELOPMENT FUND, PHASE II, LLC; UPPER MANHATTAN EMPOWERMENT ZONE DEVELOPMENT CORPORATION; SLAYTON VENTURES, LLC; SLAYTON EQUITIES; SJM PARTNERS INC.; PAUL SLAYTON, an individual, STEPHEN GARCHIK, an individual; WILLIAM "TREY" BURKE, an individual, STEPHEN McBRIDE, an individual; and DOES 1-300, inclusive,<br><br>           Defendants. | Case No. 1:20-cv-00731-PAE<br><br>**SECOND AMENDED COMPLAINT**<br><br><br>*Plaintiff Demands Trial By Jury* |

Tutor Perini Building Corp. ("<u>TPBC</u>" or "<u>Plaintiff</u>"), by and through its undersigned counsel, individually and, as to Count I of the Complaint, on behalf of all others similarly situated or class members, pursuant to Article 3-A of the N.Y. Lien Law, files this Second Amended Complaint against (1) New York City Regional Center, LLC; George Washington Bridge Bus Station And Infrastructure Development Fund, LLC; GSNMF Sub-Cde 12 LLC; GSB NMTC Investor LLC; LIIF SUB-CDE XXVI, LLC; DVCI CDE XIII, LLC; GWB NMTC Investment Fund LLC; GWB Leverage Lender, LLC; George Washington Bridge Bus Station And Infrastructure Development Fund, Phase II, LLC; Upper Manhattan Empowerment Zone Development Corporation; ("<u>Lender Defendants</u>"); (2) the Complaint is also brought against individuals and companies related to non-party George Washington Bridge Development Venture LLC, which is the subject of a pending Chapter 11 bankruptcy proceeding, including, Slayton Ventures, LLC; Slayton Equities; SJM Partners Inc.; Paul Slayton, an individual; Stephen Garchik, an individual; William "Trey" Burke, an individual; Stephen McBride, an individual; and (3) to the extent permitted by law, the Complaint is also brought against Does 1-300, inclusive, (collectively, the "<u>Defendants</u>").  Plaintiff, based on knowledge, information and belief, and, as a result of its investigation to date, alleges as follows:

## I.
## NATURE OF ACTION

1.     This Complaint asserts (a) a claim by TPBC in its representative capacity as a beneficiary of a trust under Article 3-A of the Lien Law and for the benefit of all beneficiaries or class members of said trust, for diversion of trust assets; and (b) claims held by TPBC, in its individual capacity, arising from the George Washington Bridge Bus Station development project, a major construction project located in New York City, New York.  This Complaint asserts causes

of action due to massive and coordinated fraudulent misconduct that resulted from the wrongful receipt of monies, which said funds were absconded, stolen and/or otherwise diverted from statutory trust funds.  The individual defendants and their companies in particular engaged in conduct that shocks any notion of lawful, ethic of reasonable business practice.

## II.
## JURISDICTION, VENUE AND STATUTORY PREDICATES

2.      The jurisdiction of this Court is based both upon diversity of citizenship and a federal question.

3.      First, the jurisdiction of this Court is based upon diversity of citizenship, pursuant to 28 U.S.C. § 1332(a).  The parties are citizens of different states and the amount in controversy exceeds $75,000.

4.      Second and independently, this Court has jurisdiction because TPBC asserts claims arising under the federal Declaratory Judgment Act.

5.      Venue is proper and personal jurisdiction exists because a substantial part of the events giving rise to the Complaint occurred in this District. This case is based on circumstances concerning the building of a construction project located within this District, specifically within Manhattan, New York City, New York.  Additionally, multiple Defendants reside and/or their business is conducted within the District. 28 U.S.C. § 1391(b)-(c).

6.      This case is commenced pursuant to Article 3-A of the N.Y. Lien Law (the "Lien Law"), Federal Declaratory Judgment Act and the causes of action asserted herein.

**III.**
**PARTIES**

7.      Plaintiff Tutor Perini Building Corp. is an Arizona corporation, with its principal

place of business in Nevada.  During all relevant periods of time and currently, TPBC held a valid

license to operate as a general contractor in the State of New York.

8.      TPBC alleges that Defendant New York City Regional Center, LLC ("NYCRC" or

"Regional Center") is, and at all times herein mentioned was, a limited liability company duly

formed, existing, and organized under the laws of the State of New York, with its principal place

of business in the State of New York. The managing members of NYCRC are Paul Anton

Levinshon and George Olsen, both of whom are citizens of the State of New York.

9.      TPBC alleges that Defendant George Washington Bridge Bus Station and

Infrastructure Development Fund, LLC is, and at all times herein mentioned was, a limited liability

company duly formed, existing, and organized under the laws of the State of New York, with its

principal place of business in the State of New York.  The managing member of Defendant George

Washington Bridge Bus Station and Infrastructure Development Fund, LLC is NYCRC.  NYCRC

is a limited liability company duly formed, existing, and organized under the laws of the State of

New York with its principal place of business in the State of New York. The managing members

of NYCRC are Paul Anton Levinshon and George Olsen, both of whom are citizens of the State

of New York.

10.     TPBC alleges that Defendant GSNMF SUB-CDE 12 LLC is, and at all times herein

mentioned was, a limited liability company duly formed, existing, and organized under the laws

of the State of Delaware, with its principal place of business in New York. Defendant GSNMF

SUB-CDE 12 LLC has 2 members: 1) GS New Markets Fund, LLC (which owns a .01%

membership interest and is the managing member), and 2) GWB NMTC Investment Fund, LLC

(which owns a 99.9% membership interest). GS New Markets Fund, LLC is a limited liability company and duly formed, existing, and organized under the laws of the State of Delaware, with its principal place of business in the State of New York.  GWB NMTC Investment Fund LLC is, and at all times herein mentioned was, a limited liability company duly formed, existing, and organized under the laws of the State of Delaware, with its principal place of business in New York.  GWB NMTC Investment Fund, LLC is wholly owned by 2018 NMTC Secondary Fund LLC. 2018 NMTC Secondary Fund LLC is wholly owned by Citibank N.A. Citibank N.A is wholly owned by Citicorp LLC. Citicorp LLC is wholly owned by Citigroup, Inc.  Citigroup Inc. is a corporation formed under the laws of the State of Delaware, with its principal place of business in the State of New York.

11.     TPBC alleges that <u>Defendant GSB NMTC Investor Fund LLC</u> is, and at all times herein mentioned was, a limited liability company duly formed, existing, and organized under the laws of the State of Delaware, with its principal place of business in New York.  GSB NMTC Investor LLC is the managing member of Defendant GSB NMTC Investor Fund LLC.  GSB NMTC Investor LLC is a limited liability company and duly formed, existing, and organized under the laws of the State of Delaware, with its principal place of business in New York. GSB UIG LLC is the 100% owner of the GSB NMTC Investor LLC and is a Delaware LLC with its principal place of business in the State of New York. Goldman Sachs Bank USA is the 100% owner of GSB UIG LLC.  Goldman Sachs Bank USA is Chartered Bank, chartered under the laws of the State of New York, with its principal place of business in the State of New York.

12.     TPBC alleges that <u>Defendant LIIF SUB-CDE XXVI, LLC</u> is, and at all times herein mentioned was, a limited liability company duly formed, existing, and organized under the laws of the State of Delaware, with its principal place of business in New York.  LIIF SUB-CDE XXVI,

LLC has two members: 1) GWB NMTC Investment Fund, LLC (99.9 percent) and 2) LIFF New Markets, LLC (.01% Member and Managing Member).   GWB NMTC Investment Fund, LLC is a limited liability company and duly formed, existing, and organized under the laws of the State of Delaware, with its principal place of business in the State of New York. LIFF New Markets, LLC is a Delaware a limited liability company and duly formed, existing, and organized under the laws of the State of Delaware, with its principal place of business in the State of New York.  GWB NMTC Investment Fund, LLC is wholly owned by 2018 NMTC Secondary Fund LLC. 2018 NMTC Secondary Fund LLC is wholly owned by Citibank N.A. Citibank N.A is wholly owned by Citicorp LLC. Citicorp LLC is wholly owned by Citigroup, Inc.  Citigroup Inc. is a corporation formed under the laws of the State of Delaware, with its principal place of business in the State of New York.

13.     TPBC alleges that <u>Defendant DVCI CDE XIII, LLC</u> is, and at all times herein mentioned was, a limited liability company duly formed, existing, and organized under the laws of the State of Delaware, with its principal place of business in New York.   DVCI CDE XIII, LLC has two members: 1) DV Community Investment Fund LLC is a .01% member, and 2) GWB NMTC Investment Fund LLC is a 99.9% member DV Community Investment Fund is a limited liability company and duly formed, existing, and organized under the laws of the State of Delaware, with its principal place of business in the State of New York.  GWB NMTC Investment Fund, LLC is a limited liability company and duly formed, existing, and organized under the laws of the State of Delaware, with its principal place of business in the State of New York.  GWB NMTC Investment Fund, LLC is wholly owned by 2018 NMTC Secondary Fund LLC. 2018 NMTC Secondary Fund LLC is wholly owned by Citibank N.A. Citibank N.A is wholly owned by Citicorp LLC. Citicorp LLC is wholly owned by Citigroup, Inc. Citigroup Inc. is a corporation

formed under the laws of the State of Delaware, with its principal place of business in the State of New York.

14.     TPBC is informed and believes and thereon alleges that <u>Defendant GWB NMTC Investment Fund LLC</u> is, and at all times herein mentioned was, a limited liability company duly formed, existing, and organized under the laws of the State of Delaware, with its principal place of business in New York.  GWB NMTC Investment Fund, LLC is wholly owned by 2018 NMTC Secondary Fund LLC. 2018 NMTC Secondary Fund LLC is wholly owned by Citibank N.A. Citibank N.A is wholly owned by Citicorp LLC. Citicorp LLC is wholly owned by Citigroup, Inc. Citigroup Inc. is a corporation formed under the laws of the State of Delaware, with its principal place of business in the State of New York.

15.     TPBC alleges that <u>Defendant GWB Leverage Lender, LLC</u> is, and at all times herein mentioned was, a limited liability company duly formed, existing, and organized under the laws of the State of Delaware. GWB Development Partners, LLC is the managing member of Defendant GWB Leverage Lender, LLC.   George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC is the "loan member" of GWB Leverage Lender, LLC.  GWB Development Partners, LLC is a limited liability company and duly formed, existing, and organized under the laws of the State of Delaware, with its principal place of business in New York. George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC is a limited liability company and duly formed, existing, and organized under the laws of the State of New York, with its principal place of business in New York.

16.     TPBC alleges that <u>Defendant George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC</u> is, and at all times herein mentioned was, a limited liability company duly formed, existing, and organized under the laws of the State of New

York with its principal place of business in New York.  The managing member of Defendant George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II LLC is NYCRC.  NYCRC is a limited liability company duly formed, existing, and organized under the laws of the State of New York with its principal place of business in the State of New York. The managing members of NYCRC are Paul Anton Levinshon and George Olsen, both of whom are citizens of the State of New York.

17.     TPBC alleges that Defendant Upper Manhattan Empowerment Zone Development Corporation is, and at all times herein mentioned was, a corporation duly formed, existing, and organized under the laws of the State of New York, with its principal place of business in the State of New York.

18.     TPBC alleges that Defendant Slayton Ventures, LLC is, and at all times herein mentioned was, a limited liability company duly formed, existing, and organized under the laws of the State of New York, with its principal place of business in New York. Paul Slayton is the managing member of Slayton Ventures LLC, and Paul Slayton is a citizen of the State of New York.

19.     TPBC is informed and believes and thereon alleges that Defendant Slayton Equities, also known as Slayton Equities LTD, is, and at all times herein mentioned was, a corporation, organized under the laws of the State of New York, with its principal place of business in the State of New York.

20.     TPBC is informed and believes and thereon alleges that Defendant SJM Partners Inc. is, and at all times herein mentioned was, a corporation duly formed, existing, and organized under the laws of the State of Florida, with its principal place of business in the States of Florida.

21.     TPBC is informed and believes and thereon alleges that <u>Defendant Paul Slayton,</u> an individual, is, and at all times herein mentioned was, the principal executive, agent and employee of Defendant Slayton Ventures, LLC, and was acting within the scope of such agency and employment and is his individual capacity for his own benefit, and engaged in other activities related to the allegations set forth in this Complaint. Defendant Paul Slayton is a citizen of the State of New York.

22.     TPBC is informed and believes and thereon alleges that <u>Defendant Stephen Garchik,</u> an individual is, and at all times herein mentioned was, the chief executive, agent and employee of Defendant SJM Partners Inc., and was at all times, acting within the scope of such agency and employment and is his individual capacity for his own benefit, and engaged in other activities related to the allegations set forth in this Complaint. Defendant Stephen Garchik is a citizen of the State of Florida.

23.     TPBC is informed and believes and thereon alleges that <u>Defendant William "Trey" Burke,</u> an individual, is, and at all times herein mentioned was an agent and employee of Defendant SJM Partners Inc. with the title of "Development, Senior Vice President" and acting is his individual capacity for his own benefit. Mr. Burke is a citizen of the Commonwealth of Virginia.

24.     TPBC is informed and believes and thereon alleges that <u>Defendant Stephen McBride,</u> an individual, is, and at all times herein mentioned was an agent and employee of SJM Partners Inc, with the title of "Development, Managing Principal" and acting is his individual capacity for his own benefit.  Defendant Stephen McBride is a citizen of the Commonwealth of Virginia.

25.     TPBC is informed and believes and thereon alleges that none of the defendants named in this Second Amended Complaint are citizens nor have their principal places of business in the States of Nevada or Arizona.

26.     The identities of each fictitiously named Doe defendants are unknown to Plaintiff. Plaintiff is informed and believes, and upon such information and belief thereon alleges, that each Doe defendant is in some manner legally responsible for the damages hereinafter pled.  Plaintiff will seek leave to amend this Complaint once the true and correct identities of these Doe defendants are ascertained.  The above-named defendants and DOES 1 through 300, inclusive, are collectively referred to herein as "Defendants."

## IV.
## FACTUAL BACKGROUND

### A.     The Project

27.     TPBC is a leading building construction firm offering diversified general contracting and engineering services to private clients and public agencies.  TPBC has built some of the most complex and high-profile projects in New York and throughout the country, including major sports facilities, hotels, health care centers, residential and retail facilities.

28.     The George Washington Bridge Bus Station, which first opened on January 17, 1963, acts as a transit facility operated by the Port Authority of New York and New Jersey (the "Port Authority").  The station is built over the Trans-Manhattan Expressway (Interstate 95) on property owned in fee by the Port Authority between 178th and 179th Streets and Fort Washington and Wadsworth Avenues (designated on the tax map of the City of New York as Block 2163 Lot 1 and Block 2176 Lot 17) (the "Property").

29.     On June 30, 2011, the Port Authority approved a $183.2 million renovation and improvement plan for the George Washington Bridge Bus Station (the "Project"), which is located on the Property.  The Project was a public-private venture between the Port Authority, as owner of the Property, and non-party George Washington Bridge Development Venture LLC (the "Developer"), as ground lessee and developer/contractor.  The Project included relocating the bus terminals to the third floor of the complex and creating a state-of-the-art ground transportation hub.  The Project also entailed a new 15,000 square foot bus terminal that increased the number of gates from 17 to 22.  Additionally, 85,000 square feet of the existing bus station was reconfigured and upgraded.  By relocating the bus station terminal to the third floor of the complex, a retail center of approximately 129,000 square feet was created.

30.     Upon information and belief and representations of agents of the Developer, the members of the Developer are GWB Development Partners, LLC and Marketplace GWB, LLC. Defendants Stephen Garchik, Stephen McBride and Paul Slayton (the "Individual Owners") are indirect owners of the Developer, given the multi-layered ownership structure of the Developer. One or all of the Individual Owners also own and operate Defendants Slayton Ventures, LLC, Slayton Equities, SJM Partners Inc. (the "Related Developer Entities").  Upon information and belief, Defendant William "Trey" Burke is an employee and principal agent of the Developer (hereinafter referred to with the "Individual Owners" as "Individual Owners").  Upon information and belief, Individual Owners are officers of the Developer or the companies that control the Developer.  The structure, ownership and control of the Developer may have changed from time-to-time throughout the project.

31.     On or about July 21, 2011, the Port Authority entered into a written contractual lease agreement with the Developer (the "Ground Lease").  Under the Ground Lease, the Developer

was permitted to use and operate portions of the Project as retail space for its own benefit for a period of 49 years with 5 ten year extension options (for a total leasehold term of 99 years) (the "Leased Premises"). Additionally, the Ground Lease provided that certain space would be designed and built by the Developer and returned to the Port Authority for its use to operate a bus terminal (the "Reserved Premises").  The Ground Lease provided, *inter alia*,

(a)     The scope of work for the Project at the time of execution of the Ground Lease was based on plans ("Stage I Conformed Documents") previously prepared under a separate agreement between the Port Authority and the Developer.  The Developer was obliged under the Ground Lease to advance the Stage I Conformed Documents to final plans and specifications for the work through the preparation of "working drawings, specifications, calculations, product samples and other design materials," which upon approval by the Port Authority became the "Approved Construction Documents."

(b)     The Developer was to perform "all work required to redevelop the [Reserved Premises] . . . in compliance with the Approved Construction Documents" and "all work required to construct the public areas of the Leased Premises, including without limitation all Common Areas . . . the core and shell of the entire Leased Premises," and other sub-tenant fit-out work, including "all work necessary to properly complete the entire Project as contemplated by and in compliance with the Approved Construction Documents (collectively, the 'Construction Work'), including all site work, demolition work, staging and phasing, construction work, utility relocation . . ., and equipment procurement and installation."

(c)     The Construction Work was to be performed at the Developer's sole cost and expense except (i) the Port Authority agreed to pay the Developer the fixed price of $52,650,558 for the construction of the Reserved Premises, subject to adjustment as provided in

the Ground Lease, payable monthly upon approval by the Port Authority of progress payment applications submitted by the Developer evidencing the work that "was performed by the [Developer]" during the previous month, and (ii) the Port Authority authorized the Developer, in accordance with certain specified terms, to procure construction loans and other financing secured by mortgages on the Developer's leasehold estate in portions of the Property to finance the remainder of the Developer's hard and soft construction costs for the Project.

(d)     The Port Authority retained certain control over the Construction Work as the Project Owner, including but not limited to, (i) the Approved Construction Drawings could not be modified without the Port Authority's approval, (ii) the Developer was required to perform changes in the work in the Reserved Premises directed by the Port Authority, (iii) the Developer was prohibited from engaging any contractor or permitting any subcontractor to perform Construction Work on the Project without the Port Authority's approval of the contractor or subcontractor, (iv) the right to issue badges and control who was permitted on the construction site, (v) the Developer was required to consult with the Port Authority for "instructions and/or decisions relating to 'field-condition' construction matters" and to comply with the Port Authority's decisions, (vi) the Port Authority had the right to monitor and inspect Construction Work, (vii) if Port Authority determined any of the Construction Work was non-compliant by the Developer, the Port Authority had the right to direct the Developer to correct such work, (viii) the Developer was required to provide the Port Authority with certain updates; and (ix) the Developer was required to abide by numerous conditions, requirements, and limitations established by the Port Authority on the Developer's construction operations.

32.     On June 26, 2013, the Developer and TPBC entered into a written contract (the "Construction Contract"), whereunder the parties acknowledged the Developer was contractually

obligated under the Ground Lease to perform certain construction work on the Project, and, to the extent set forth in the Construction Contract, TPBC assumed to the Developer "the same obligations and responsibilities expressly and or [sic] relating to the scope of work, quality of work, time and schedule requirements, or character of work as are assumed by the [Developer] to the Port Authority" under certain specified provisions of the Ground Lease.   The Developer expressly reserved in the Construction Contract the right to perform construction or operations related to Project with the Developer's own forces or to award separate contracts in connection with other portions of the Project, in which case, the Developer agreed it would coordinate the activities of TPBC under the Construction Contract with the activities being performed by the Developer and/or the other contractors.   And, in fact, TPBC was contracted to conduct only certain work on the Project, including making structural changes and reconstructing certain buildings on the Project site.   TPBC was contracted to conduct the construction work on the "build-out" of only a single retail space, but not the remaining multiple retail spaces, including a fitness center, grocery store, restaurants and other spaces, which was done by others retained by the Developer and unaffiliated with TPBC. TPBC commenced work under the Construction Contract in late 2013.

33.     The Project is not complete at this time.   On June 21, 2019, the Developer, through its principal manager, Stephen J. Garchik, prepared and signed an affidavit filed in federal court indicating that the Project is not yet complete. (See USDC-SDNY Action, 1:19-cv-05344-RA, Docket No. 22, paragraphs 10 and 13).   On November 25, 2019, the Developer filed a pleading with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 19-13196 (SCC); Developer's *Reply to Tutor Perini Building Corp.'s Objection to the Motion to Approve Bidding Procedures*; Bankruptcy Docket No. 87, paragraph 8) in which it stated, "Because all Final Punch List Items have not been completed, the Port Authority has not

made the Final Payment."  Exhibit A to that same pleading contains a settlement agreement between the Developer and the Port Authority which states, "the Project will be complete upon completion of the New Egress."  In addition, TPBC, through its lower-tier subcontractor, Siemens, continued to conduct certain services under through the Construction Project into the 2020 calendar year. Therefore, based on such information and belief, the Project was not complete as of the filing of this lawsuit on January 27, 2020.

34.     Based on information and belief, the Developer's sole source of revenue since the Project opened was construction funds and rental payments from sublesees of the Leased Premises, and the Developer's sole asset is the leasehold under the Ground Lease.

**B.      The Developer Received Funds for the Purpose of Paying Costs of Improvements but Defendants Slayton Ventures, LLC, Slayton Equities, SJM Partners Inc, Paul Slayton, Stephen Garchik, William "Trey" Burke and Stephen McBride, Does 1-100, Diverted those Funds to Themselves and Others**

35.     Each month, following the completion of scheduled work, TPBC would issue the Developer a payment application seeking compensation for costs and labor expended on the Project that month.  In accordance with industry practice, this initial payment application was dubbed a "pencil copy," because it was subject to review and revision by both the Developer and the Port Authority.  Indeed, the Developer would frequently make changes and negotiate payment application figures with TPBC, and then submit its own version dubbed the "final copy."

36.     The final copy, as agreed upon by all parties, was signed and notarized by TPBC and formally submitted to the Developer.  The Developer then applied to the Port Authority and the Developer's lenders for the disbursement of funds specifically for the purpose of paying TPBC and others for their construction work.

37.     As to TPBC, the Developer made progress payments in connection with payment applications Nos. 1 through 29.  However, despite issuing approved final copies for payment

applications Nos. 30 through 44, the Developer failed to make payments thereon.  These payment applications alone, Nos. 30 through 44, plus the project retention fund, exceed $29 million.

**C.     The Arbitration Proceeding**

38.     Due to claims submitted by TPBC and its subcontractors concerning, among other things, delays, design changes and extra work costs incurred in construction of the Project, and the Developer's failure to pay TPBC its contract balance for completion of the Project including 15 monthly payments due under payment applications Nos. 30 through 44, the matter was submitted to the dispute resolution provisions of the Construction Contract.

39.     On February 26, 2015, the Developer initiated an arbitration proceeding (the "Arbitration Proceeding") by filing a demand for arbitration with the American Arbitration Association, pursuant to their Construction Industry Rules. The Arbitration Proceeding is styled as *George Washington Bridge Bus Station Development Venture, LLC v. Tutor Perini Building Corp.*, American Arbitration Association, Case No. 01-15-0002-7887.  The demand sought declaratory relief and a determination of the pending claims submitted by the contractors on the Project.  TPBC filed an answer and counterclaim, as amended, seeking damages against the Developer, on behalf of itself and its subcontractors.

40.     The parties selected an arbitration panel comprising three senior construction attorneys, Dennis Cavanaugh, Gregory Beckwith, and John Fieldsteel (the "Panel"), which was appointed on March 31, 2016.

41.     Following extensive discovery, the parties submitted amended pleadings on March 30, 2018, wherein TPBC alleged a claim of $120 million, with the Developer seeking $3.8 million. Certain small claims were resolved during the course of the proceedings, but remain unpaid.

42.     In March and July 2018, the parties submitted extensive expert reports and rebuttal reports on the merits and damages sought by the parties.  The parties exchanged documents and discovery, and commenced hearings on August 22, 2018, with a site visit by the Panel.  Testimony on the merits of the claims began in the Arbitration Proceedings on September 24, 2018.  TPBC put on its case-in-chief first.  By the time that the Developer commenced its Chapter 11 Case, the Panel had conducted 67 days of evidentiary hearing on the merits regarding Project delays, change orders, and the unpaid contract balance claim.  The last hearing on the merits took place on April 12, 2019, with two additional in-person hearings on issuance and enforcement of TPBC's attachment motion on May 22, 2019, and September 6, 2019.

43.     TPBC concluded the presentation of its affirmative claims on April 10, 2019, proving its amended claims for $113 million by the requisite standard.  TPBC's claims were supported by expert and fact witness testimony and voluminous documentary evidence.

44.     The Arbitration Proceeding was interrupted when, on April 15, 2019, all of the lawyers of record for the Developer, at two different law firms, withdrew from the case.  It was later learned that the Developer had not paid the lawyers for over four months.  However, once the Developer hired new legal counsel, the parties were able to schedule further hearing dates with the Panel.  This resulted in the vacation of hearing dates scheduled from May to early November 2019, with the hearings scheduled to commence again on November 18, 2019.  On October 7, 2019, the Developer filed its Chapter 11 bankruptcy petition, staying the Arbitration Proceeding and forcing the parties to vacate all scheduled hearing dates.  As of the filing of this Second Amended Complaint, the Arbitration Proceedings remain stayed.

45.     TPBC's damages asserted in the arbitration at the time the matter was stayed total $113,251,238 (plus millions of dollars of interest and arbitration costs) and is summarized in the chart below.

| Type | Damages |
|---|---|
| Steel and Chipping Work Claim – Direct Cost Proposed Change Inquiry ("PCI") Claims | $4,552,838 |
| Steel and Chipping Work Claim – Impact Claim | $8,700,923 |
| Time Impact Analysis and Request for Time Extension #1, #2 with General Condition and Impact Damages ($23,642,744 in Extended Time-Related Costs, $14,867,554 in Cumulative Impacts, $2,472,508 in Premium Time PCI Claim, and $801,429 Additional Direct Costs PCI related to Delay) | $41,784,235 |
| PCI Damages – Direct Cost Claims on Individual PCIs (Non-Steel) | $10,071,231 |
| TPBC's Claim for the Delay/Impact to Subcontractor WDF Inc. | $6,512,692 |
| TPBC's Claim for the Delay/Impact to Subcontractor Five Star Electric Corp. | $10,572,295 |
| TPBC's Claim for the Delay/Impact to Subcontractor Associated Specialty Contracting, Inc. | $783,492 |
| Contract Balance, Payment Applications 30-44 and Retention | $29,131,950 |
| Subtotal | **$112,109,656** |
| Settlement of All Non-Steel PCIs under $20,000 before Hearing | $914,224 |
| Settlement of Various PCIs during Hearings | $227,358 |
| GRAND TOTAL | **$113,251,238** |

## D.     *Application for Equitable Relief*

46.     Prior to the commencement of the hearings on the merits in the Arbitration Proceeding, on June 29, 2018, TPBC filed an application for an order of attachment and a preliminary injunction with the Panel (the "Application") to (a) freeze the $29,131,856.16 approved under payment applications Nos. 30 through 44, plus retention, and allocated to compensate TPBC for work performed in connection with the Project and (b) place the funds in an escrow account monitored by an independent third-party, thereby enjoining the Developer from withdrawing, spending, transferring, dissipating, assigning, encumbering, disposing of, or otherwise using those funds.

47.     The Application was based in part on then-recently discovered evidence stating that Developer, the Related Developer Entities and certain Individual Owners were contemplating filing for bankruptcy to avoid paying the Developer's debt to TPBC.

48.     The Developer and the Individual Owners, who were the representatives, declarants and client contacts of the Developer in the Arbitration Proceeding, including their counsel of record in the Arbitration, represented, both verbally and through certain filings, to the Panel and the parties that TPBC was not at risk and there no basis for an injunction or attachment.  These include oral representations made during an oral argument conducted with the Arbitration Panel on August 22, 2018, and statements made thereafter by the Developer's representatives.  The Developer further represented to the Arbitration Panel and others that it had no plans to declare bankruptcy, despite internal Developer emails written to the contrary.  On September 14, 2018, the Panel declined the injunction.  After further briefing, the Panel permitted the Application for the attachment to be renewed at a later time.

49.     On February 15, 2019, TPBC presented in the Arbitration the contract balance claim which established the unpaid balance of $29,131,856.16.  The claim was not contested on the merits or calculation of the claim.  After introduction of the approved payment applications, related correspondence and other evidence, the parties stipulated to a demonstrative chart setting for the contract balance dates, payments and calculation.

50.     TPBC concluded the presentation of its affirmative claims on April 10, 2019 and rested its case.  The Developer began its defensive case on April 11, 2019, and presented a witness on Thursday and Friday, April 11 and 12, 2019.

51.     In a sudden and unexpected development, on Monday, April 15, 2019, all of the lawyers of record for Developer, at two different law firms, simultaneously withdrew from their representation of the Developer in the Arbitration Proceedings.

52.     Shortly thereafter, TPBC renewed the Application for the attachment.  The renewal was based on three premises: (a) that TPBC had rested its case, proved its damages, including showing a likelihood of success in receiving an award on the contract balance portion of the claim; (b) the financial insolvency of the Developer demonstrated by the withdrawal of its attorneys; and (c) the extension of time sought by the Developer in the proceedings.  The Developer retained attorneys to represent it during the renewal proceedings.  The Panel conducted a proceeding on the renewal, including the Developer filing papers, through its attorneys retained for such purposes, and conducting a hearing on May 22, 2019.

53.     On June 4, 2019, the Panel issued an order granting the Application and issued an order of attachment of Twenty-Three Million dollars ($23,000,000.00),  ("Attachment Order").

54.     On July 15, 2019, the Attachment Order was confirmed by the U.S. District Court for the Southern District of New York ("SDNY") (See USDC-SDNY Action, 1:19-cv-05344-RA) and judgment thereon was entered on July 22, 2019.

**E.      Developer's Failure to Comply with Attachment Order and Subsequent Disclosures and Continued Diversion of Funds**

55.     Despite the confirmation of Attachment Order and Judgment, the Developer and the Individual Owners refused to comply therewith.

56.     On June 20, 2019, TPBC filed a sanctions motion with the Panel seeking relief from Developer's failure to comply with the Attachment Order, including the failure to disclose the location of project funds, the continuing disbursement of project funds, and the failure to comply with the attachment.  TPBC also submitted post-judgment discovery through its confirmation

lawsuit with SDNY to obtain information relating to the location of the funds to enforce the Attachment Order.

57.     Developer responded to both the sanctions motion and the post-judgment discovery with an Affidavit by Defendant Stephen Garchik, indicating that Developer was not in possession of the $23 million TPBC sought to attach.  Defendant Stephen Garchik affirmed that Developer "has very limited cash on hand."

58.     The Panel scheduled a hearing for September 6, 2019, pertaining, *inter alia*, to Developer's failure to disclose the location of the funds to be attached and its inquiry was limited to funds in Developer's possession from the date of entry of the Attachment Order.

59.     During that September 6, 2019 hearing, Developer refused to provide principals of the Developer as expressly ordered by the Panel, but instead produced witness Stephen Winiarski, a bookkeeper hired as a project accountant by the Developer specifically for this Project, to testify regarding the Developer's financial status as of the entry of the Attachment Order.  Mr. Winiarski is not an employee of the Developer, but rather an employee of his own corporation, Envirocon Financial, Inc.  The Developer was represented by its business attorneys during these proceedings. The hearing was transcribed by the certified court reporter.

60.     Mr. Winiarski testified that Developer had not received payments from the Port Authority or loan disbursements from the Developer's lenders since late March or early April 2017 to his knowledge, and no such funds were in Developer's primary bank account on June 4, 2019 – the date the Panel entered its Attachment Order.  This was in direct contradiction to prior statements made on behalf of the Developer by its attorneys during the original attachment proceedings, including statements made on August 22, 2018.

21

61.     Upon information and belief, Developer and the Individual Owners were effectively in possession and control of those funds and prioritized the Developer's obligation to a favored lender in direct violation of the Panel's Attachment Order, as confirmed by the SDNY.

62.     Upon information and belief, there were also payments, authorized and directed by one or all of the Individual Owners, that Winiarski made, for purposes other than the payment for the construction work on the Project, including payments to the Developer's principals.  Mr. Winiarski testified he was aware of the Attachment Order, but violated it at the direction of Paul Slayton and/or Stephen Garchik.

63.     As a result of that hearing on September 6, 2019 and subsequent briefing and a telephonic hearing on September 24, 2019, on October 3, 2019, the Panel issued a further order finding against the Developer that:

> "After consideration of the written submissions, the evidence and arguments presented at the September 6th hearing, and oral argument, the Panel finds that the GWBDV [Developer] willfully violated the Panel's Interim Orders dated June 4, 2019.  The Panel finds that GWBDV transferred funds subject to the Interim Order of attachment for the payment of personal expenses of one of its principals, Douglas Slayton and for the payment of legal expenses of GWBDV.  The Panel further finds GWBDV wrongfully transferred net rental income received to its third-party lender, George Washington Bridge Bus Station and Infrastructure Development Fund, LLC ("Infrastructure Fund")."

64.     In addition, the Panel ordered the return of certain funds paid to "Douglas Slayton", "Stephen J. Garchik", "all payments/wire transfers to Sterling National for George Washington Bridge Bus Station and Infrastructure Development Fund, LLC." and others.  The Panel further ordered that TPBC was entitled to have the address of Project included in the judgment to administer the attachment.

65.     On Friday, October 4, 2019, TPBC filed the October 3, 2019, order of the Panel with the District Court seeking to amend the Court's July 22, 2019, Judgment of attachment

confirming the original attachment order of the Panel dated June 4, 2019 (Case No. 1:19-cv-05344-RA; Docket 55).

F.  **The Chapter 11 Case**

66.     On Monday, October 7, 2019, the Developer commenced a Chapter 11 proceeding in the United States Bankruptcy Court for the Southern District of New York by filing a petition for relief under Chapter 11 of the Bankruptcy Code, which was assigned Case No. 19-13196-scc. Upon the filing of the Chapter 11 Case, the automatic stay under 11 U.S.C. § 362 stayed the Arbitration Proceeding and the District Court action.  The Developer is not a party to this action.

**V.**
**CAUSES OF ACTION**

**COUNT I**

**WRONGFUL DIVERSION OF MONIES FROM TRUST FUND**

**(Article 3-A N.Y. Lien Law (§ 70, et seq.))**

**(By Plaintiff on behalf of itself and all others similarly situated, pursuant to Article 3-A of the N.Y. Lien Law, Against All Defendants, including New York City Regional Center, LLC; George Washington Bridge Bus Station And Infrastructure Development Fund, LLC; GSNMF Sub-Cde 12 LLC; GSB NMTC Investor LLC: LIIF SUB-CDE XXVI, LLC; DVCI CDE XIII, LLC; GWB NMTC Investment Fund LLC; GWB Leverage Lender, LLC; George Washington Bridge Bus Station And Infrastructure Development Fund, Phase II, LLC; Defendant Upper Manhattan Empowerment Zone Development Corporation; Slayton Ventures, LLC; Slayton Equities; SJM Partners Inc.; Paul Slayton, an Individual; Stephen Garchik, an individual; William "Trey" Burke, an individual; Stephen McBride, an individual; and Does 1-300, inclusive)**

67.     The Plaintiff restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

68.    The Developer is a "contractor" under the New York State Lien Law § 2(9) as it entered into the Lease with the Port Authority for the improvement of the Property, which is owned by the Port Authority.

69.    The Developer is also an "owner" under Lien Law § 2(3) as it is defined as a lessee under the Lease.

70.    Under Article 3-A of the Lien Law, the funds received by Developer under or in connection with the Ground Lease are the assets of a trust (the "Article 3-A Trust") which may only be used for the payment of the architects, contractors, subcontractors, and material suppliers and for certain other specified purposes.

71.    The Ground Lease authorized the Developer, under certain terms and conditions, to procure construction loans and other financing secured by mortgages on the Developer's leasehold estate in portions of the Property to finance the remainder of the Developer's hard and soft construction costs for the Project.  The Developer procured loans from a variety of sources to finance the Construction Work it was obliged to perform under the Ground Lease, and the proceeds of those loans are assets of the Article 3-A Trust.

72.    On or about July 20, 2011, the Developer procured a loan in an amount not to exceed $72 million from Defendant George Washington Bridge Bus Station and Infrastructure Development Fund, LLC ("Senior Lender") secured by a mortgage against the Developer's leasehold estate on the Property and an assignment of leases and rents in connection with the Developer's leasehold estate on the Property.  The Senior Lender loan agreement and mortgage expressly provides that, *inter alia*, (a) the proceeds of the Senior Lender loan would be used solely to finance the hard and soft costs of construction of the Project; (b) the Developer would construct the Project in accordance with the approved plans and specifications, which could not be modified

without the Senior Lender's prior approval; (c) the Senior Lender had the right to monitor the progress of construction with a consultant hired by the Senior Lender at the Developer's cost; (d) the Developer was obliged to deliver to the Senior Lender reports on the status of construction; (e) the Developer would pay the Senior Lender an origination fee of two percent (2%) of the amount of each advance made to the Developer; (f) the loan proceeds were part of an Article 3-A Trust "to be applied first for the purpose of paying any unpaid costs of the Improvements before any part of the same is used for any other purpose"; and (g) the Developer was expressly prohibited from using the loan proceeds to pay interest or origination fees.

73.     On or about December 26, 2013, the Developer procured a loan in an amount up to $19.065 million from Defendants GSB NMTC Investor LLC, GSNMF Sub-CDE 12 LLC, LIIF Sub-CDE XXVI, LLC, DVCI CDE XIII, LLC, GWB NMTC Investment Fund LLC, and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC. (collectively, the "Co-Lenders") secured by a building loan mortgage against the Developer's leasehold estate on the Property and the assignment and pledge of the Developer's accounts.  The Co-Lenders loan agreement and mortgage expressly provides that, *inter alia*, (a) the proceeds of the Co-Lenders loan would be used solely to finance the hard and soft costs of construction of the Project; (b) the Co-Lenders' obligation to fund was conditioned on its review and approval of, among other things, the Ground Lease, the Construction Contract, and a consent from TPBC to the assignment of the Construction Contract to the Co-Lenders; (c) the Co-Lenders would retain a Construction Consultant to, among other things, verify the work claimed under a Draw Request filed by the Developer and to approve the Plans and any changes thereto ; (d)  the Developer would pay Co-Lenders' fees and expenses, including but not limited to, asset management fees, audit and tax reimbursements, success fees, management fees, administration and compliance expenses and

fees, and the cost of the Administrative Agent, its Construction Consultant, and its attorneys; (e) the Developer pre-approved in the Loan Agreement the use of loan proceeds to pay the foregoing fees and expenses of the Co-Lenders and interest on the Co-Lenders' loan; and (f) the loan was "subject to the trust fund provisions of the Lien Law" and the loan proceeds would be deposited by the Developer into a "Building Loan Trust Account" for the purpose of paying only the cost of the improvements.

74.     On or about April 7, 2014, the Developer procured a loan in an amount up to $9 million from Defendant GWB Leverage Lender, LLC ("Leverage Lender") secured by a pledge by Marketplace GWB, LLC of its membership interest in the Developer.  The Leverage Lender loan agreement expressly provides, *inter alia*, (a) the proceeds of the Leverage Lender loan would be used solely to pay the Direct and Indirect Costs of construction of the Project; (b) Leverage Lender's prior written consent was required for any amendments to the Construction Contract or any of the major subcontracts; (c) Leverage Lender would retain a Construction Consultant to, among other things, monitor the progress of construction, review the Developer's requests for advances to verify the work has been substantially and satisfactorily completed, and other similar services; (d) the Developer would pay certain fees and expenses of Leverage Lender, including but not limited to, the costs of the Construction Consultant and Leverage Lender's taxes (except for its income, franchise, or branch profits taxes); and (e) the Developer was required to submit periodic reports to the Leverage Lender on the status of construction.

75.     On or about February 27, 2018, the Developer procured a loan in the principal sum of $5 million from Defendant Upper Manhattan Empowerment Zone Development Corporation ("UMEZ") secured by a mortgage against the Developer's leasehold estate on the Property and an assignment of leases and rents in connection with the Developer's leasehold estate on the Property.

The UMEZ loan agreement and mortgage expressly provides that, *inter alia*, (a) the proceeds of the UMEZ loan would be used solely to pay for the costs incurred or to be incurred in the completion of the construction, fit-out and leasing of the Project and for certain loan closing costs; (b) the Developer disclosed to UMEZ that there was a pending arbitration between the Developer and TPBC (the "Arbitration Proceeding") and that TPBC, the architect for the Project, and other subcontractors and suppliers claimed to be owned approximately $101 million for work performed on the Project; (c) the Developer agreed to complete the construction of the Project in accordance with the approved plans and specifications, which could not be modified without UMEZ's prior approval; (d) UMEZ had the right to monitor the progress of construction with a consultant hired by the UMEZ at the Developer's cost; (e)  the Developer was obliged to deliver to UMEZ periodic reports on the status of construction and of the Arbitration Proceeding; (e) the Developer would pay UMEZ at the closing an origination fee of $125,000 and other costs and would reimburse UMEZ for all reasonable out-of-pocket costs, including fees for outside counsel; and (f) the loan proceeds were part of an Article 3-A Trust "to be applied first for the purpose of paying any unpaid costs of the Improvements before any part of the same is used for any other purpose."

76.    Defendants George Washington Bridge Bus Station and Infrastructure Development Fund, LLC; GSNMF Sub-CDE 12 LLC; GSB NMTC Investor LLC; LIIF Sub-CDE XXVI, LLC; DVCI CDE XIII, LLC; GWB NMTC Investment Fund LLC; George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC; GWB Leverage Lender, LLC; and Upper Manhattan Empowerment Zone Development Corporation collectively are referred to as the "Lender Defendants."

77.    TPBC is informed and believes, and based thereon alleges, that each of the aforementioned loans was fully funded and the Article 3-A Trust includes (a) the $52,650,558,

subject to adjustment as provided in the Ground Lease, in funds paid or payable to the Developer by the Port Authority under the Ground Lease; (b) the $72 million in loan proceeds paid or payable to the Developer pursuant to the loan with the Senior Lender; (c) the $19.065 million in loan proceeds paid or payable to the Developer pursuant to the loan with the Co-Lenders; (d) the $9 million in loan proceeds paid or payable to the Developer pursuant to the loan with the Leverage Lender; and (e) the $10 million in loan proceeds paid or payable to the Developer pursuant to the loan with UMEZ.

78.     TPBC and the other beneficiaries of the Article 3-A Trust furnished labor, materials and equipment which were used in and for the improvement of the Project and were furnished for and were applied in the construction of the Project.  There is now due, owing and unpaid from the Developer to the beneficiaries (which include TPBC and other similarly-situated parties) of the Article 3-A Trust in excess of $113,251,231.

79.     Notwithstanding the outstanding unpaid claims of the beneficiaries of the Article 3-A Trust, TPBC is informed and believes, and based thereon alleges, that the Developer paid, transferred or applied assets of the Article 3-A Trust for numerous purposes other than and prior to the payment or discharge of amounts due, or to become due, to the trust beneficiaries, and that each such use constitutes a diversion of trust assets, including but not limited to, (a) the payment of interest, origination fees, loan closing costs, asset management fees, compliance fees, audit and tax reimbursements, administration and compliance expenses, success fees, attorney's fees, and construction monitoring costs to the Lender Defendants, and each of them; (b) the repayment of loan principal to Lender Defendants; (c) payments made to the Individual Owners and Related Developer Entities, and each of them; (d) payments made by the Developer to fund the Arbitration Proceedings; and (e) other payments made to Defendants, and each of them.  The Individual

Owners, and each of them, knew or should have known that the funds received by the Developer from the Port Authority and the Lender Defendants were to be used to pay for the construction work on the Project.  TPBC is informed and believes, and based thereon alleges that the Individual Owners, and each of them, had possession, custody, or control over the assets of the Article 3-A Trust and, in their capacity as statutory trustees of said Trust, instructed, authorized, or caused the Developer to disburse funds from the Article 3-A Trust for purposes other than the payment or discharge of amounts due, or to become due to beneficiaries of the trust and in breach of their fiduciary duty to such beneficiaries.

80.     TPBC alleges that Doe defendants 1 through 25 are owners, partners, members, agents, employees, principals and the persons with an interest in and acting on behalf of or in concert with the Developer, and which, upon amendment of the Complaint to add this defendant by its true identity, will be referred to as an "Individual Owners."  TPBC alleges that Doe defendants 26 through 50 are owners, related or affiliated companies, or alter egos, with an interest in and acting on behalf of or in concert with the Developer, and which, upon amendment of the Complaint to add this defendant by its true identity, will be referred to as a "Related Developer Entity."  TPBC alleges that Doe defendants 51 through 99 are persons or entities which received a distribution of assets of the Article 3-A Trust for a purpose other than the payment or discharge of amounts due or to become due to beneficiaries of the trust.  All references in this Complaint to a defined category of Defendants shall also refer to the corresponding Doe defendants as described above, and each of them.

81.     TPBC alleges that Defendants Does 100-300 are EB-5 investors, which used the Defendants New York City Regional Center, LLC, George Washington Bridge Bus Station and Infrastructure Development Fund, LLC, George Washington Bridge Bus Station and Infrastructure

Development Fund, Phase II, LLC and certain of their affiliates as their agents to make the EB-5 contributions to the Developer and to otherwise administer their investments in the Developer and the Project.  Defendants Does 100-300 are therefore properly imputed with all of the Defendant New York City Regional Center, LLC's, George Washington Bridge Bus Station and Infrastructure Development Fund, LLC, George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC, and their affiliates' actual or constructive knowledge regarding the transfers.  Upon information and belief, substantial portions of the funds transferred by the Developer to Defendant New York City Regional Center, LLC, George Washington Bridge Bus Station and Infrastructure Development Fund, LLC, George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC and their affiliates were, in turn, transferred by Defendant New York City Regional Center, LLC, George Washington Bridge Bus Station and Infrastructure Development Fund, LLC, George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC and their affiliates to the EB-5 investors.

82.    Plaintiff asserts this cause of action on its own behalf and on behalf of all beneficiaries of the Article 3-A Trust created in connection with the Project.

83.    One year has not elapsed since the completion of the Project within the meaning of Article 3-A of the Lien Law.

84.    The Court should compel the Individual Owners, and each of them, to provide a final accounting of the Article 3-A Trust, including the identification of (a) the source and amount of all funds which were at any time assets of the Article 3-A Trust and (b) the amount and recipient of any Article 3-A Trust assets for a purpose other than the payment or discharge of an amount owed to a trust beneficiary.

85.     The Court, based on such final accounting, should enter an Order (a) requiring each Defendant that was the recipient of such diverted funds to return such funds to the Article 3-A Trust together with interest on each such payment from the date the diverted payment was received by that Defendant, (b) requiring the Individual Owners, and each of them, as statutory trustees, to restore the entirety of the diverted funds to the Article 3-A Trust, with interest on each such payment from the date of each diverted payment, and (c) establishing a procedure for distribution of the recovered funds to the beneficiaries of the Article 3-A Trust and the disposition of the remaining balance, if any, after all trust claims have been paid or discharged in full.

## COUNT II

## DECLARATORY JUDGMENT

### (Declaratory Judgment Act)

**(By Plaintiff Against the Lender Defendants, including New York City Regional Center, LLC; George Washington Bridge Bus Station And Infrastructure Development Fund, LLC; GSNMF Sub-Cde 12 LLC; GSB NMTC Investor LLC: LIIF SUB-CDE XXVI, LLC; DVCI CDE XIII, LLC; GWB NMTC Investment Fund LLC; GWB Leverage Lender, LLC; George Washington Bridge Bus Station And Infrastructure Development Fund, Phase II, LLC; Defendant Upper Manhattan Empowerment Zone Development Corporation; and Does 1-300, inclusive)**

86.     The Plaintiff restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

87.     The Ground Lease was entered into by the Developer and the Port Authority.  The Ground Lease remains in effect as a valid and binding contract for, *inter alia*, the lease of the Project by the Port Authority to the Developer.

88.     The advances by the Defendants were subordinated to the claims of other creditors. Section 14A.10 of the Ground Lease provides that:

> <u>Subordination</u>.   Notwithstanding anything contained in any
> Mortgage or in this Article 14A, it is understood and agreed that the
> rights of the holder of any Mortgage, including a Recognized
> Mortgagee, shall be subject and subordinate to [the Ground Lease].
> The terms, covenants, conditions and provisions of [the Ground
> Lease] shall govern as between the Port Authority, the [Developer]
> and any Recognized Mortgagee, and in the event of any
> inconsistency between the terms, covenants, conditions and
> provisions of [the Ground Lease] and the terms, covenants,
> conditions and provisions of any Mortgage, the terms, covenants,
> conditions, and provisions of [the Ground Lease] shall control. …
> Any Mortgage granted hereunder shall make reference to the
> provisions of [the Ground Lease] and shall provide that the
> Mortgage and the rights of the Recognized Mortgagee thereunder
> are and shall be in all respects subject to all provisions of [the
> Ground Lease].

89.     Under section 14A.10 of the Ground Lease, the claims of any contractor,

subcontractor, material-men and workmen retained on the Project would be senior to any purported

mortgage, not least because section 5.7(c) of the Ground Lease expressly provides for the payment

of such parties.

90.     Section 5.7(c) provides, in relevant part, that:

> [p]rovided that the Port Authority shall pay the amounts due and
> owing under Section 5.4 hereof, the [Developer] shall pay all claims
> lawfully made against it by its contractors, subcontractors, material-
> men and workmen and all claims lawfully made against it by other
> third persons arising out of or in connection with or because of the
> performance of the Construction Work and shall cause its
> contractors and subcontractors to pay all such claims lawfully made
> against them.

91.     The provisions of the Ground Lease relating to, *inter alia*, the payment of the

contractors and subcontractors on the Project were entered into to benefit such parties.  For

example, section 5.7(c) of the Ground Lease specifically provides for the direct performance—

*i.e.*, payment—by the Developer to TPBC (and the other contractors and subcontractors) of

amounts required to be paid under the Construction Contract.  Other circumstances surrounding

the execution of the Ground Lease and the retention of TPBC as general contractor for the Project pursuant to the Construction Contract demonstrate that TPBC was an intended beneficiary of the Ground Lease, including the fact that the Port Authority and the Developer knew that TPBC was the general contractor for the Project.  The Port Authority has even acknowledged that TPBC is a beneficiary of the terms of the Ground Lease.  *See* Port Authority Reply ¶ 68[1].

92.     In a letter dated July 20, 2011, the Regional Center agreed that it would lend money for the Project subject to the terms of the Lease.  The Regional Center stated: "In addition to commercially standard loan terms in New York City, *the Loan will be made subject to and in accordance with the terms and conditions of the Agreement of Lease* between The Port Authority of New York and New Jersey and George Washington Bridge Bus Station Development Venture, LLC. [sic] entered into in connection with the Project."  Accordingly, Regional Center made loans to the Developer having expressly acknowledged that its leasehold mortgage and the remedies thereunder were subject to and in accordance with the terms of the Lease – including Sections 5.7(c) and 14A.10.

93.     TPBC (and the other contractors and subcontractors) were to receive immediate and ongoing benefit from the applicable provisions of the Ground Lease.  For example, section 5.7(c) of the Ground Lease provides for the timely payment of TPBC, and under the Construction Contract, TPBC was entitled to regular construction payments from the Developer.

---

[1] A true and correct copy of the Response of the Port Authority to (I) Debtor's Opposition to Tutor Perini Building Corp.'s Motion for an Order Granting (A) Relief from the Automatic Stay with Respect to the Tutor Perini Arbitration and (B) Related Relief; and (II) Objection and Joinder of New York City Regional Center, LLC to Debtor's Opposition to Tutor Perini Building Corp.'s Motion for an Order Granting (A) Relief from the Automatic Stay with Respect to the Tutor Perini Arbitration and (B) Related Relief can be found at can be found in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 19-13196 (SCC), Docket No. 135, dated January 16, 2020.

94.     Because TPBC is an intended third-party beneficiary of the Ground Lease, TPBC is entitled to the benefits of section 14A.10 of the Ground Lease, which subordinates the liens and claims of the Lenders to the liens and claims held by the Port Authority and TPBC.  Due to such subordination, TPBC should be paid out of the proceeds of any disposition of the Ground Lease before the Lender Defendants receive any such proceeds.

## COUNT III

## COMMON LAW CONVERSION

**(By Plaintiff Against the Individual Owners and Related Developer Entities, including Slayton Ventures, LLC; Slayton Equities; SJM Partners Inc.; Paul Slayton, an Individual; Stephen Garchik, an individual; William "Trey" Burke, an individual; Stephen McBride, an individual; and Does 1-300, inclusive)**

95.     Plaintiff restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

96.     During the pendency of the Project, TPBC became the beneficial owner of specific sums of money which was to be paid to TPBC for construction work upon the Project.  These sums of money include: (a) TPBC's  pro rata share (based on the sum of $113,251,231, together with interest and costs thereon, due and owing to TPBC ) of the Article 3-A Trust Funds, which were the property of TPBC and other trust beneficiaries who furnished labor, materials and equipment which were used in and for the improvement of the Project, based on the sum of $113,251,231, together with interest and costs thereon, due and owing to TPBC, and (b) in the event the Article 3-A Trust is for some reason deemed invalid, the $29,131,856.16 paid by the Port Authority and Lender Defendants to Developer upon final copies of payment applications Nos. 30 through 44 and for acknowledged retention for the Project ("TPBC Contract Balance"), and (c) the funds and other assets subject to the Attachment Order.  For purposes of this Conversion action, TPBC's

share of the Article 3-A Trust Funds and the TPBC Contract Balance will be collectively referred to as the "TPBC Funds").

97.     The Individual Owners, who were the executive officers or principals of Developer and the Related Developer Entities, had control over the TPBC Funds that were being held in the possession of the Developer.

98.     During the time that the Individual Owners and the Related Developer Entities were in possession and control of the TPBC Funds, the Individual Owners, on their own behalf and on behalf of Developer made or caused to be made hundreds of unauthorized transfers of the TPBC Funds to individuals and entities other than the trust beneficiaries in violation of Article 3-A of the Lien Law and/or the Attachment Order, including, but not limited to the Individual Owners themselves, the Related Developer Entities, and the Lender Defendants, according to proof.

99.     By making the unauthorized transfers of TPBC Funds, the Individual Owners and Related Developer Entities, acting for themselves and on behalf of Developer, exercised dominion and control of the TPBC Funds.  Thus, the Individual Owners took, stole, and/or absconded with the aforesaid TPBC Funds, and converted same for their own benefit, use and control.

100.    None of the aforementioned transfers of TPBC Funds were authorized by TPBC, who had continued throughout this period to demand payment of the TPBC Contract Balance, as well as payment of additional TPBC Funds that had been received by Developer for payment of TPBC's claims for additional compensation, delays and impacts incurred upon the Project.  In fact, TPBC wrote several letters to the Developer demanding that the funds be held in trust pending the outcome of the Arbitration Proceedings and warning the Developer that any transfer of such funds would be in violation of New York law.

101.    Upon learning the Individual Owners were exercising dominion and control over TPBC Funds, TPBC made specific demands for return of the TPBC Funds which TPBC knew had been transferred to the Developer by the Port Authority and by the Lender Defendants for the purpose of paying TPBC.  To that end, TPBC made multiple demands for payment and filed and prosecuted a claim for compensation in the Arbitration.  In addition, TPBC filed a request to the Panel requesting attachment of the $29,131,856.16 which constituted the TPBC Contract Balance.

102.    Despite TPBC's consistent demands for return of the absconded TPBC Funds, the Individual Owners refused to return the TPBC Funds upon which they had exercised wrongful dominion and control.  The Individual Owners, acting for themselves and in their capacity as executive officers and principals of Developer, resisted TPBC's demands for payment of the TPBC Funds and resisted TPBC's two requests for attachment.

103.    As the direct and proximate result of the Individual Owners' and Related Developer Entities conversion of the TPBC Funds, Plaintiff has suffered general, consequential and special damages, and interest thereon.

104.    The acts of the Individual Owners and Related Developer Entities in converting the TPBC Funds were performed intentionally and/or with reckless disregard of Plaintiff's property and/or legal rights, as demonstrated by the Panel's finding that the transfers to the Individual Owners and Related Developer Entities were made in willful disregard of the Panel's Order of Attachment.

105.    By reason of the above, the Individual Owners and Related Developer Entities are jointly and severally liable to Plaintiffs in an amount to be determined at trial.

106.    By reason of the above, the Individual Owners and Related Developer Entities are jointly and severally liable to Plaintiff for to punitive damages in an amount to be determined at trial.

## COUNT IV

## CONSTRUCTIVE FRAUD

**(By Plaintiff Against the Individual Owners and Related Developer Entities, including Slayton Ventures, LLC; Slayton Equities; SJM Partners Inc.; Paul Slayton, an Individual; Stephen Garchik, an individual; William "Trey" Burke, an individual; Stephen McBride, an individual; and Does 1-300, inclusive))**

107.    Plaintiff restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

108.    As owners, principals and officers of the Developer and the representatives of the Developer on the Project and during the Arbitration Proceeding, the Individual Owners and Related Developer Entities were aware of TPBC's claims against the Developer for its work to improve the Property and the Project.   Moreover, the Individual Owners, and the Related Developer Entities, and each of them, were aware that funds obtained by the Developer, whether from the Port Authority or from the Lender Defendants, were funds intended to pay for construction work on the Project, and thus were part of the Article 3-A Trust.

109.    It is believed and therefore alleged that the Individual Owners, each of them collectively and individually, including specifically Slayton Ventures, LLC, Slayton Equities, SJM Partners Inc., Paul Slayton, Stephen Garchik, William "Trey" Burke and Stephen McBride were directly involved in the payment application process, submission of payment applications to the Port Authority and Lenders, receipt of funds from the Lenders and Port Authority, and/or the distribution of such funds.

110.    Each month, including for Payment Applications 30-44 that remain unpaid to TPBC, TPBC would prepare two payment application drafts (one for the Reserved Premises and one for Leased Premises), wherein William "Trey" Burke and other Developer project staff would engage with TPBC in monthly meetings to review the payment applications, revise and edit those payment applications to reach agreement on the scope and percentage of work complete, and approve the completion of the work and expenditures on the Project by TPBC and its subcontractors.  These monthly payment applications were further discussed, in detail, during every Bi-Weekly Project Meeting.  These meetings were attended by William "Trey" Burke and often by Stephen McBride, as the representatives of the Developer, wherein the payment applications and expenditures on the construction project were discussed in detail.  Once discussed and approved with the Developer, TPBC would sign and certify the payment application and formally submit them to the Developer.

111.    Thereafter, the Individual Owners would cause these approved and signed payment applications to be submitted to the Lenders and Port Authority, so the payment application amounts, along with other expenditures for designers and others would be funded.

112.    Once the approved payment application funds were received by the Developer, Paul Slayton, Stephen Garchik and others, would direct the distribution of the received funds to the Individual Owners and others.  These distributions were done by the Individual Owners with knowledge that the funds were collected based on the completed construction work of TPBC.

113.    The Individual Owners, each of them, acted on their own behalf and collectively as a group for the benefit of each other,  engaged in acts to collect funds from the Port Authority and Lenders, and to retain those funds collected by the benefit of TPBC in contradiction of their fiduciary obligations to TPBC.

114.    The Individual Owners further were aware that the Port Authority and Lenders had made payment to Developer of the TPBC Contract Balance of approximately $29 million, which represented payment applications 30-44 and retention.

115.    As principals, owners and officers of the Developer, the Individual Owners are trustees of the Article 3-A Trust Funds.

116.    Additionally, as transferees of the Article 3-A Trust Funds, the Individual Owners and the Related Developer Entities are trustees of those funds under the Lien Law.

117.    As a statutory trustee, the Individual Owners and Related Developer Entities were obligated to act as fiduciary manager of the Article 3-A Trust Funds.  The Individual Owners therefore owed TPBC, one of the beneficiaries of the Article 3-A Trust Funds, a duty of loyalty and were required to administer the trust solely in the interest of the beneficiaries of the Article 3-A Trust, including TPBC.

118.    In addition to the Lien Law, the Individual Owners and Related Developer Entities had a statutory and common law fiduciary duty to TPBC to protect Project funds belonging to TPBC.

119.    TPBC made its initial application for attachment to the Panel on or about June 29, 2018.  The Developer and the Individual Owners, who were the representatives, declarants and client contacts of the Developer in the Arbitration Proceeding, including their counsel of record in the Arbitration, represented, both verbally and through certain filings, to the Panel and the parties that TPBC was not at risk and there no basis for an injunction or attachment. These include oral representations made during an oral argument conducted with the Arbitration Panel on August 22, 2018, and statements made thereafter by the Developer's representatives. The Developer further represented to the Arbitration Panel and others that it had no intention of declaring bankruptcy,

despite internal Developer emails written to the contrary.  The Individual Owners and Related Developer Entities were aware of the disclosure by Developer's counsel in the Arbitration Proceeding and made no efforts to correct the disclosure.

120.   These statements by the Individual Owners, by themselves and through their attorneys of record, were made for the purpose of (a) preventing the Panel from issuing an attachment of the Trust Funds held by Developer, and (b) preventing TPBC from ceasing performance of additional work on the Project for nonpayment or taking such other legal measures as it had available, including appealing the Panel's ruling denying the initial request for attachment to the Court or instituting additional legal proceedings in the Courts to enforce its rights to the TPBC Funds.

121.   The Panel and TPBC believed the representations of the Individual Owners to be true and, consequently, they both justifiably relied upon the representations of the Individual Defendants and Developer, as made through their attorneys, that funds which were the property of TPBC were being held by Developer for the benefit of TPBC and its subcontractors and would be paid over to TPBC upon completion of the Arbitration.  After these representations, the Panel refused TPBC's initial application for attachment in July 2018, and TPBC  forewent instituting other legal action in the state, federal or bankruptcy courts to enforce its rights to the TPBC Funds.

122.   As described above, TPBC made a second request for attachment to the Panel on or about April 22, 2019.  The Panel granted TPBC's request by Order of June 4, 2019 and attached the sum of $23,000,000, which was confirmed by the United States District Court for the Southern District of New York on July 15, 2019, and entered as a judgment of attachment on July 22, 2019. As owners and officers of the Developer and the representatives of the Developer in the Arbitration Proceeding, the Individual Owners and Related Developer Entities were aware of the Order of

Attachment issued by the Panel freezing $23,000,000 from the amounts the Developer and the Individual Owners and Related Developer Entities previously represented was being held by the Developer to satisfy TPBC's claims in the Arbitration Proceeding.

123.   The representations by the Individual Owners, by themselves and through their counsel that the Developer was holding funds to pay TPBC claims should TPBC prevail in the Arbitration were false.   In fact, the Developer was not holding funds to pay TPBC claims. Developer, through the Individual Owners made numerous transfers of TPBC Funds to themselves, to the Related Developer Entities, and to the Lender Defendants, effectively depleting the funds purportedly being held for owed to TPBC to zero.   By way of example, on July 19, 2018, the Developer transferred the sum of $1,152,666.67 to Defendant New York City Regional Center, and on January 10, 2019, Developer transferred $1,165,333.33 to Defendant New York City Regional Center.   Upon information and belief, Developer and the Individual Owners made many tens of additional transfers of funds belonging to TPBC despite their representations that they were holding TPBC Funds for the benefit of TPBC.   This information is within the sole custody and control of Developer and the Individual Owners.

124.   As evidenced by the sworn testimony of Stephen Winiarski, the Developer's Project accountant, on September 6, 2019 in the Arbitration Proceeding, the Individual Owners and Related Developer Entities were effectively in possession and control of the Article 3-A Trust Funds and authorized and directed payments of those trust funds to themselves and the other Defendants during the Arbitration Proceeding and after the Order of Attachment had been issued, despite the Individual Owners' knowledge of TPBC's claims, the Developer's and the Individual Owners and Related Developer Entities' representations to TPBC and the Panel and the directions set forth in the Order of Attachment.   Mr. Winiarski testified that Defendants Steven Garchik and

Paul Slayton were the officers of Developer that had the authority to make transfers of funds from Developer accounts, and that both of them did in fact direct transfers of funds form Developer's accounts despite knowledge of their obligations to hold the funds for the benefit of TPBC.

125.    By authorizing and directing these transfers to themselves and the other Defendants, the Individual Owners and Related Developer Entities deprived TPBC of its share of the Article 3-A Trust Funds, and breached the fiduciary duty owed by the Individual Owners to TPBC.

126.    In addition to the violation under the Lien Law, the Individual Owners and Related Developer Entities in having transferred project funds belonging to TPBC to themselves and others had a statutory and common law fiduciary duty over those funds, which the Individual Owners and Related Developer Entities violated by wasting, disposing, transferring and other misappropriating the money of TPBC.

127.    As the direct and proximate result of the constructive fraud accomplished by the acts described, TPBC has suffered general, consequential and special damages in an amount to be determined at trial.

128.    The acts of the Individual Owners described herein were performed intentionally and/or with willful disregard of TPBC's property and/or legal rights, such that each of the Individual Owners are guilty of oppression, fraud, or malice, and TPBC is entitled to recover exemplary or punitive damages from the Individual Owners for the sake of example and by way of punishment.

129.    In addition, TPBC is entitled by law to recover its costs of suit herein and to obtain such other and further relief as the Court may order.

## V.
## DEMAND FOR TRIAL BY JURY

130.    Pursuant to Federal Rule of Civil Procedure 38 and other applicable law, Plaintiff, on behalf of itself, and, as to Count I of the Complaint, on behalf of all others similarly situated, demand a trial by jury on all issues so triable.

## VI.
## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, TPBC requests that judgment be entered against the Defendants as follows:

A.    On Count I, entering a judgment against (i) Defendants named therein that were the recipient of diverted funds to return such funds to the Article 3-A Trust together with interest on each such payment from the date the diverted payment was received by that Defendant, and (ii) the Individual Owners, and each of them, as statutory trustees, to restore the entirety of the diverted funds to the Article 3-A Trust, with interest on each such payment from the date of each diverted payment, and establishing a procedure for distribution of the recovered funds to the beneficiaries of the Article 3-A Trust and the disposition of the remaining balance, if any, after all trust claims have been paid or discharged in full.

B.    On Count II, entering a judgment against Defendants named therein finding that (a) TPBC is a third-party beneficiary of the Ground Lease and, as such, entitled to enforce its terms and (b) as such, TPBC is entitled to the benefit of section 14A.10 of the Ground Lease and therefore should be paid out of the proceeds of any disposition of the Ground Lease before the Lenders receive any such proceeds.

C.      On Count III, entering a judgment in favor of TPBC against Defendants named therein for their conversion of funds in an amount to be determined at trial.

D.      On Count IV, entering a judgment in favor of TPBC against Defendants named therein for their constructive fraud in an amount to be determined at trial.

E.      On all Counts, entering a judgment in favor of TPBC against Defendants for interest on the amount of judgment.

F.      On all Counts, entering a judgment in favor of TPBC against Defendants for costs of this suit.

G.      On all Counts, entering a judgment in favor of TPBC against Defendants for attorney fees to the extent permitted by law or contract.

H.      On all Counts, for other judgment that the Court finds just.

Respectfully submitted,

DATED:    May 11, 2020


/s/ ROBERT NIDA

**NIDA & ROMYN, P.C.**
Robert Nida
1900 Avenue of the Stars, Suite 650
Los Angeles, CA  90067
Telephone:  (310) 286-3400
rnida@nidaromyn.com

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
Ira M. Schulman
Emily D. Anderson
30 Rockefeller Plaza
New York, NY 10112-0015
Telephone: (212) 653-8700
ISchulman@sheppardmullin.com
Emanderson@sheppardmullin.com