UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TUTOR PERINI BUILDING CORP.,
*individually and, as to Count I of the Complaint,*
*on behalf of all others similarly situated, pursuant*
*to Article 3-A of the N.Y. Lien Law,*

                                        Plaintiff,

                    -v-

NEW YORK CITY REGIONAL CENTER, LLC,
GEORGE WASHINGTON BRIDGE BUS STATION
AND INFRASTRUCTURE DEVELOPMENT FUND,
LLC, GSNMF SUB-CDE 12 LLC, GSB NMTC
INVESTOR LLC, LIIF SUB-CDE XXVI, LLC, DVCI
CDE XIII, LLC, GWB NMTC INVESTMENT FUND
LLC, GWB LEVERAGE LENDER, LLC, GEORGE
WASHINGTON BRIDGE BUS STATION AND
INFRASTRUCTURE DEVELOPMENT FUND,
PHASE II, LLC, UPPER MANHATTAN
EMPOWERMENT ZONE DEVELOPMENT
CORPORATION, SLAYTON VENTURES, LLC,
SLAYTON EQUITIES, SJM PARTNERS INC., PAUL
SLAYTON, *an individual*, STEPHEN GARCHIK, *an*
*individual*, WILLIAM "TREY" BURKE, *an individual*,
STEPHEN MCBRIDE, *an individual*, and DOES 1–300,
*inclusive*,

                                        Defendants.

20 Civ. 731 (PAE)

OPINION &
ORDER

---

PAUL A. ENGELMAYER, District Judge:

        This case involves claims that funds intended for the renovation of the George

Washington Bridge Bus Station in upper Manhattan ("Project") were misappropriated.  Plaintiff

Tutor Perini Building Corp. ("TPBC") was hired by non-party George Washington Bridge

Development Venture LLC ("Developer") to provide construction work on the Project.  But,

TPBC alleges, the Developer, which is now in bankruptcy proceedings and not a party here,

defaulted on its payment obligations to TPBC and others.  The Developer's inability to pay,

TPBC alleges, resulted from its unlawful diversion of funds it had received from the Port Authority of New York and New Jersey ("Port Authority") and various lenders.  TPBC now sues a score of entities involved in that alleged misappropriation, including the Developer's owners, several related entities, and the Developers' lenders (but not the Developer itself, given its bankruptcy).

TPBC brings claims for wrongful diversion of trust assets under Article 3-A of the New York Lien Law, *see* N.Y. Lien Law § 70 *et seq.*, conversion, and constructive fraud against various individuals and entities associated with the Developer.  Those are: Slayton Ventures, LLC ("Slayton Ventures"), Slayton Equities, SJM Partners Inc. ("SJM Partners"), Paul Slayton, Stephen Garchik, William "Trey" Burke, Stephen McBride, and 300 Doe defendants (together, "Developer Affiliates").

TPBC also sues nine lenders, who allegedly received some funds diverted by the Developer Affiliates, also under the New York Lien Law.  It seeks a declaratory judgment against those lenders, too, declaring TPBC's interests in proceeds related to the Project superior to those of the lenders.  Those lenders are: New York City Regional Center, LLC ("NYCRC"), George Washington Bridge Bus Station and Infrastructure Development Fund, LLC ("GW Bridge Fund I"), George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC ("GW Bridge Fund II," and together with NYCRC and GW Bridge Fund I, "Senior Lenders"); GSNMF SUB-CDE 12 LLC ("GSNMF"), GSB NMTC Investor LLC ("NMTC Investor"), LIIF SUB-CDE XXVI, LLC ("LIIF"), DVCI CDE XIII, LLC ("DVCI"), GWB NMTC Investment Fund LLC ("NMTC Investment Fund"), and GWB Leverage Lender, LLC ("Leverage Lender," and together with GSNMF, NMTC Investor, LIIF, DVCI, and NMTC Investment Fund, "Co-Lenders"); and Upper Manhattan Empowerment Zone Development

Corporation ("UMEZ," and collectively with the Senior Lenders and Co-Lenders, "Lender Defendants").

Defendants have filed four motions to dismiss—one by the Developer Affiliates, one by the Senior Lenders, one by the Co-Lenders, and another by UMEZ, although for the most part all Lender Defendants rely on arguments made by the Senior Lenders in their briefing. The Developer Affiliates move to dismiss for failure to state a claim under Rule 12(b)(6) and for lack of subject-matter jurisdiction under Rule 12(b)(1), for want of diversity jurisdiction. The other defendants move solely under Rule 12(b)(6).

For the following reasons, the Court grants the motion by the Developer Affiliates in part and denies it in part, and grants the motions filed by all three sets of Lender Defendants.

I.    **Background**

A.    **Factual Background**[1]

1.    **Parties**

a.    *Plaintiff*

TPBC is an Arizona corporation with a principal place of business in Nevada. SAC ¶ 7. It is a "leading building construction firm," which has built "some of the most complex and high-

---

[1] This factual account draws from the Second Amended Complaint, Dkt. 73 ("SAC"). *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). To resolve the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

To resolve the Developer Affiliates' motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the Court relies on the materials submitted by the parties after jurisdictional discovery, Dkts. 105 ("Canini Decl."), 107 ("Nida Decl."). *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings.").

profile projects in New York and throughout the country, including major sports facilities, hotels, health care centers, residential and retail facilities." *Id.* ¶ 27.

>   a.   *Developer Affiliates*

Paul Slayton is the principal executive of Slayton Ventures.  He is a citizen of New York. *Id.* ¶ 21.

Stephen Garchik is the chief executive of SJM Partners.  He is a citizen of Florida.  *Id.* ¶ 22.

Stephen McBride is the Managing Principal for Development of SJM Partners.  He is a citizen of Virginia.  *Id.* ¶ 24.

William "Trey" Burke is the Senior Vice President for Development of SJM Partners. He is a citizen of Virginia.  *Id.* ¶ 23.

Slayton Ventures is a New York LLC whose only member is a citizen of New York.  *Id.* ¶ 18; Nida Decl. ¶ 18.

Slayton Equities is a New York corporation with its principal place of business in New York.  SAC ¶ 19.

SJM Partners is a Florida corporation with its principal place of business in Florida.  *Id.* ¶ 20.

The SAC alleges that Slayton, Garchik, and McBride each own or operate the Developer and Slayton Ventures, Slayton Equities, and SJM Partners ("Related Developer Entities"), and that each is in some way related to the Developer or entities that directly own it.  *Id.* ¶ 30.  The SAC alleges Burke is an employee of SJM Partners; it does not allege that Burke owns or controls any of the above entities.  *Id.*

b.      *Lender Defendants*

TPBC alleges that each Lender Defendant lent money to the Developer for use on the Project, and later improperly received trust funds from the Developer as repayment for the principal on those loans, as interest, and as payment of fees or costs.  *Id.* ¶¶ 72–76, 79.

NYCRC is a New York LLC, whose members are citizens of New York, Florida, or South Korea.  *Id.* ¶ 8; Nida Decl. ¶ 10.  TPBC alleges that it both agreed to lend money to the Project in 2011, and received payments from the Developer in 2018.  SAC ¶¶ 92, 123.

GW Bridge Funds I and II are LLCs, whose members all are citizens of China.  *Id.* ¶¶ 9, 16; Nida Decl. ¶¶ 11–12.  TPBC alleges that GW Bridge Fund I lent $72 million to the Developer in 2011 and that GW Bridge Fund II contributed a portion of a $19 million loan to the Developer in 2013.  SAC ¶¶ 72–73.  It also alleges that each later improperly received funds comprising repayment of those loans, interest, and other fees from the Developer.  *Id.* ¶¶ 76, 79.

GSNMF is a Delaware LLC whose members are all citizens of either New York or Delaware.  *Id.* ¶ 10; Nida Decl. ¶ 13.

NMTC Investor is a Delaware LLC whose members are all citizens of New York or Delaware.  SAC ¶ 11; Nida Decl. ¶ 14.

LIIF is a Delaware LLC whose members are all citizens of New York, California, or Delaware.  SAC ¶ 12; Nida Decl. ¶ 15.

NMTC Investment Fund is a Delaware LLC whose members are all citizens of New York or Delaware.  SAC ¶ 14; Nida Decl. ¶ 16.

DVCI is a Delaware LLC whose members are citizens of New York, Delaware, and Arizona.  SAC ¶ 13; Nida Decl. ¶ 19.  DVCI has two members: NMTC Investment Fund and DV Community Investment LLC ("DV").  As stated, NMTC Investment Fund is a citizen of New York and Delaware.  DV has three members:  Dudley Ventures LLC, James D. Howard, and

Johanna G. Kato.  Canini Decl., Ex. A at 7.  Howard and Kato are "full-time residents of Arizona."  *Id.*; *see* Nida Decl. ¶ 19.

GSNMF, NMTC Investor, LIIF, NMTC Investment Fund, and DVCI are each alleged to have contributed, along with GW Bridge Fund II, a portion of the 2013 $19 million loan to the Developer.  SAC ¶ 73.  Each also allegedly improperly received from the Developer repayment of that loan's principal, interest, and related fees.  *Id.* ¶¶ 76, 79.

Leverage Lender is a Delaware LLC whose members are citizens of New York, Virginia, Colorado, Maryland, and Washington DC.  *Id.* ¶ 15; Nida Decl. ¶ 17.  TPBC alleges that it lent the Developer $9 million in 2014, and later improperly received from the Developer repayment of that loan's principal, interest, and related fees.  SAC ¶¶ 74, 76, 79.

UMEZ is a New York corporation with its principal place of business in New York.  *Id.* ¶ 17.  TPBC alleges that it lent the Developer $5 million in 2018, for use in connection with the Project.  *Id.* ¶ 75.  Like the other Lender Defendants, UMEZ allegedly received improper payments from the Developer.  *Id.* ¶¶ 76, 79.

Aside from DVCI, each LLC defendant has stated that none of its members, nor any of the members of its sub-entity owners, is a citizen of Arizona or Nevada.  *See generally* Nida Decl. ¶¶ 10–20.  Thus, with the exception of DVCI, all defendants are citizens of different states than is TPBC.

### c.      *"Doe" Defendants*

The SAC names 300 "Doe" defendants, some allegedly affiliated with the Developer, and the rest, investors who made contributions to the Project through the Co-Lender entities.  SAC ¶¶ 80–81.

### 2.      The Project

#### a.      *The George Washington Bridge Bus Station*

The George Washington Bridge Bus Station ("Station") is a transit facility operated by the Port Authority. *Id.* ¶ 28.  It is located over the Trans-Manhattan Expressway, between 178th and 179th Streets and Fort Washington and Wadsworth Avenues, on property owned in fee simple by the Port Authority ("Property").  *Id.*

On June 30, 2011, the Port Authority approved a $183.2 million renovation and improvement plan for the Station—the Project. *Id.* ¶ 29.  The Project was a public-private venture between Port Authority and the Developer, who served as ground lessee and, according to TPBC, developer and contractor.  *Id.*  The purpose of the Project was to (1) relocate the Station's existing bus terminal from its existing location to the third floor of the Property; (2) renovate the old terminal space to create a massive new retail center; and (3) add a new bus terminal.  *Id.*  The Project remains incomplete.  *Id.* ¶ 33.

#### b.      *Agreements Governing the Project*

##### i.      2011 Ground Lease

On July 21, 2011, the Port Authority and Developer entered into a lease agreement ("Ground Lease").  *Id.* ¶ 31.  Under that lease, the Developer could use portions of the property as a retail space for its own benefit for a lease term of up to 99 years.  *Id.*  But it also agreed that it would design and build other portions of the Property and return them to the Port Authority for use as a bus terminal.  *Id.*  As to the latter portion of the Property, the Developer assumed responsibility for performing "all work necessary to properly complete the entire Project . . . , including all site work, demolition work, staging and phasing, construction work, utility relocation . . . , and equipment procurement and installation."  *Id.* ¶ 31(b).  The Project was to be funded by $53 million provided by the Port Authority, along with authorized construction loans

obtained by the Developer, to be secured by mortgages on the Developer's leasehold interest.  *Id.* 31(c).  Under the Ground Lease, the Port Authority had substantial control over the construction work associated with the Project, including through its approval of all final plans and specifications, *id.* ¶ 31(a), and continuing approval, consultation, monitoring, and inspection of various aspects of the development, *id.* ¶ 31(d).

ii.      2013 Construction Contract

On June 26, 2013, TPBC contracted with the Developer to assume many, but not all, of the Developer's construction obligations under the Ground Lease.  *Id.* ¶ 32.  Under their contract ("Construction Contract"), TPBC worked on only one retail space on the Property as well as the relocation of the bus terminal, and the Developer retained responsibility for performing the work on several other retail spaces under the Ground Lease, either on its own or through other contractors like TPBC.  *Id.*

c.      *TPBC's Work and Payment*

In late 2013, TPBC commenced work under the Construction Contract.  *Id.* ¶ 32.  The Developer paid TPBC for that work in monthly "progress payments."  *Id.* ¶ 35.  To obtain those payments, TPBC first submitted to the Developer a draft application detailing its costs and labor from the prior month.  *Id.*  After the Developer and Port Authority reviewed and revised such application, TPBC submitted a final copy of its application for the month, again to the Developer.  *Id.*  The Developer then applied to the Port Authority and Developer's lenders for disbursement of those specific funds and, after receiving the requested disbursements, the Developer remitted payment to TPBC.  *Id.* ¶¶ 35–36.  TPBC then retained a portion of those funds and disbursed the remainder to its subcontractors.  *Id.*

The Developer made progress payments on TPBC's first 29 final applications.  *Id.* ¶ 37. But despite submitting final applications to the Port Authority for the next 15 progress payments

8

submitted by TPBC, the Developer did not remit payment on those applications to TPBC.  *Id.*
TPBC alleges that the outstanding payments on those applications, plus a "project retention
fund," exceed $29 million.  *Id.*

### 3.    The Arbitration Proceeding

On February 26, 2015, after TPBC and its subcontractors had made several unsuccessful
claims to the Developer, including for nonpayment of monthly progress payments, the Developer
began an arbitration proceeding.  *Id.* ¶¶ 38–39.

On June 29, 2018, TPBC applied to the arbitral panel for an order of attachment, seeking
a preliminary injunction freezing the $29 million in approved progress payments and directing
the Developer to place those funds in an escrow account monitored by a third party.  *Id.* ¶ 46.
TPBC claimed that it had discovered evidence that the Developer, its owners, and several related
entities were contemplating filing for bankruptcy to avoid paying TPBC for its work.  *Id.* ¶ 47.
The Developer opposed the request, representing to the panel that it did not plan to declare
bankruptcy and that TPBC was not at risk of nonpayment.  *Id.* ¶ 48.  On September 14, 2018, the
panel denied the attachment request without prejudice.  *Id.*

On September 24, 2018, after fact and expert discovery, the parties began an evidentiary
hearing on the merits of their claims.  *Id.* ¶ 42.  On April 10, 2019, after nearly 70 hearing days,
TPBC concluded its case in chief, and claimed $113 million.  *Id.* ¶ 43.[2]  The Developer then began
to present its case.  *Id.* ¶ 50.  However, on April 15, 2019, the proceeding was derailed when all of
the Developer's lawyers withdrew from the case because the Developer had not paid them in
four months.  *Id.* ¶¶ 44, 51.  Soon after, TPBC renewed its application for an attachment, citing

---

[2] TPBC's SAC supplies a detailed breakdown of those damages, including the $29 million owed
in progress payments, $18 million owed to its three subcontractors, $13 million for "steel and
chipping work" claims, and $41 million for additional direct costs relating to delays.  *Id.* ¶ 45.

the Developer's now-obvious financial difficulties. *Id.* ¶ 52. Although the Developer retained new attorneys and opposed the request, on June 4, 2019, the panel granted it, issuing an order of attachment on $23 million. *Id.* ¶¶ 52–53.

On June 20, 2019, TPBC filed a sanctions motion with the panel, alleging that the Developer had flouted the attachment order. *Id.* ¶ 56. In response, the Developer submitted an affidavit by Garchik stating that the Developer did not possess the $23 million and had "very limited cash on hand." *Id.* ¶ 57. Then, in a September 6, 2019 hearing on TPBC's motion, the Developer's witness testified—allegedly contradicting the Developer's representations at the time of the first attachment application—that the Developer had not received payments from the Port Authority since April 2017, and lacked any such funds as of the date of the attachment. *Id.* ¶¶ 58–60. On October 3, 2019, the panel issued an order finding that the Developer willfully violated the attachment order, wrongfully using the funds subject to that order to pay Douglas Slayton's personal expenses, the Developer's legal fees, and GW Bridge Fund I. *Id.* ¶ 63.

### 4. The Developer's Bankruptcy

On October 7, 2019, the Developer filed for Chapter 11 bankruptcy, automatically staying the arbitration and all scheduled hearing dates. *Id.* ¶¶ 44, 66. On July 14, 2020, the bankruptcy court issued a bench ruling, under 11 U.S.C. § 105(a) and Bankruptcy Rule 9019, approving a settlement agreement between the Port Authority, Developer, and the Developer's lenders. Dkt. 99-1 ("Bankr. Order"), Ex. A ("Bankr. Tr."). The bankruptcy court also addressed an objection to the agreement filed by TPBC, which had sought clarification that the agreement would not affect its rights to certain payments under the Ground Lease. Overruling that objection, the bankruptcy court, after a thorough discussion, concluded that "Tutor Perini is not a third-party beneficiary of the ground lease and cannot otherwise assert a cure claim on account of the ground lease." *Id.* at 80; *see id.* at 65–81. It granted TPBC a "carve out" for litigation in

other forums, but only to the extent that its claims were "not inconsistent with the Court's ruling here today." *Id.* at 80–81.

On August 12, 2020, the bankruptcy court issued a written order approving the settlement. *See* Bankr. Order. That Order also concluded that "(a) Tutor Perini is not a third-party beneficiary of the Ground Lease and (b) Tutor Perini has no right to assert a cure claim pursuant to Section 365 of the Bankruptcy Code." *Id.* at 5. It permitted TPBC to pursue claims against lenders, the Port Authority, and "other non-Debtor third parties, including current or former officers of the Debtor." *Id.* But TPBC, it provided, could only do so "to the extent those claims and causes of action are not inconsistent with this Court's Order." *Id.* TPBC has appealed that order. Its appeal is pending in this District, before Judge Rakoff. *See* No. 20 Civ. 7433 (JSR), Dkt. 1.

### 5.    The Alleged Trust Funds

TPBC alleges that certain funds received by the Developer from the Port Authority and the Lender Defendants are covered by N.Y. Lien Law Article 3-A, which makes certain funds received by a property owner or contractor for the payment of building and construction work trust funds subject to specific limited uses. SAC ¶¶ 67–70. Those funds include the following:

On July 20, 2011, the Developer procured a $72 million loan from GW Bridge Fund I, secured by a mortgage against the Developer's leasehold estate in the Property and rents in connection with that estate. *Id.* ¶ 72. The applicable loan agreement provided, *inter alia*, that the proceeds would be used solely for construction work on the Project, that the Developer would provide GW Bridge Fund I status updates on that work, and that the proceeds were part of an Article 3-A trust "to be applied first for the purpose of paying any unpaid costs of the Improvements before any part of the same is used for any other purpose." *Id.*

On December 26, 2013, the Developer procured another loan, of up to $19 million, from NMTC Investor, GSNMF, LIIF, DVCI, NMTC Investment Fund, and GW Bridge Fund II, secured by a similar mortgage against the Developer's leasehold estate and the assignment of Developer's accounts. *Id.* ¶ 73. The applicable loan agreement similarly provided, *inter alia*, that the proceeds would solely fund the construction of the Project, that the lenders would retain a consultant to verify certain funded work, the Developer would pay some lenders' fees, and that the proceeds were "subject to the trust fund provisions of the Lien Law." *Id.*

On April 7, 2014, the Developer procured a third loan, up to $9 million, from Leverage Lender, secured by a pledge by one of Developer's members' membership interest in the Developer. *Id.* ¶ 74. The applicable loan agreement provided for terms like the December 26, 2013 loan described above, but lacked any reference to the trust status of the proceeds or Article 3-A. *Id.*

On February 27, 2018, the Developer procured a final loan, up to $5 million, from UMEZ, secured by a mortgage against the Developer's leasehold estate on the Property and an assignment of leases and rents in connection with that estate. *Id.* ¶ 75. The applicable loan agreement contained similar requirements, again including that all funds would be used for construction costs associated with the Project, providing for UMEZ's approval of plans and specifications, requiring periodic status reports to UMEZ, and stating that the proceeds were "part of an Article 3-A Trust." *Id.* ¶ 75.

TPBC alleges that, together with the Port Authority's $53 million contribution to the Project, these four loans comprise the corpus of a trust under Article 3-A of the N.Y. Lien Law. *Id.* ¶ 77. It also alleges that $113 million of that fund is due to it and others similarly situated for their work associated with the Project. *Id.* ¶ 78. But, it contends, the Developer Affiliates

improperly diverted these funds, including by (1) paying fees, costs, and reimbursements to the

Lender Defendants; (2) repaying loan principal to the Lender Defendants; (3) paying themselves;

and (4) paying the Developer to fund the arbitration against TPBC. *Id.* ¶ 79.

### B. Procedural History

On January 27, 2020, TPBC filed the Complaint, Dkt. 1, and, on March 24, 2020, an

Amended Complaint. Dkt. 61 ("FAC"). On April 20, 2020, defendants filed four motions to

dismiss. Dkts. 63–70. On April 24, 2020, the Court ordered TPBC either to amend its complaint

or oppose the motions to dismiss by May 11, 2020, and stated that "[n]o further opportunities to

amend will ordinarily be granted." Dkt. 72.

On May 11, 2020, TPBC filed the SAC. On June 1, 2020, defendants again filed four

motions to dismiss. The Developer Affiliates moved to dismiss both for lack of subject-matter

jurisdiction, given TPBC's failure to identify the citizenship of all defendants, and for failure to

state a claim. Dkt. 75 ("Dev. Aff. Mem."). The Senior Lenders moved to dismiss TPBC's Lien

Law claim for failure to state a claim, and asked the Court to abstain from addressing TPBC's

claim for a declaratory judgment. Dkt. 77 ("Lenders Mem."). The Co-Lenders largely joined the

Senior Lenders' brief, and made limited additional arguments specific to the claims against them.

Dkt. 79 ("Co-Lenders Mem."). Similarly, UMEZ filed its own motion to dismiss, largely relying

on the Senior Lenders' arguments while also noting certain issues specific to it. Dkt. 81

("UMEZ Mem.").

On June 15, 2020, TPBC filed two briefs in opposition. The first addressed arguments of

the Developer Affiliates. Dkt. 84 ("Pl. Dev. Opp'n"). The second addressed arguments of the

Lender Defendants. Dkt. 85 ("Pl. Lender Opp'n"). TPBC also moved for limited jurisdictional

discovery to uncover the citizenship of several LLC defendants. Dkts. 86–88.

13

On June 22, 2020, defendants filed four replies.  Dkts. 89 ("Lenders Reply"), 90 ("Co-Lenders Reply"), 91 ("Dev. Aff. Reply"), 93 ("UMEZ Reply").

Also on June 22, 2020, the Developer Affiliates opposed TPBC's request for jurisdictional discovery.  Dkt. 92.  On June 24, 2020, TPBC replied in support of its discovery motion.  Dkt. 95.

Also on June 24, 2020, the Senior Lenders filed a notice of supplemental authority, about TPBC's objection in the bankruptcy proceeding.  Dkt. 94.  On June 25, 2020, TPBC responded to that letter.  Dkt. 98.  On August 13, 2020, the Senior Lenders filed another notice, informing the Court of the bankruptcy court's ruling on the settlement agreement and TPBC's status under the Ground Lease.  Dkt. 99.

On December 29, 2020, the Court issued an opinion and order granting TPBC's motion for limited jurisdictional discovery, and calling for supplemental briefing on the Court's subject-matter jurisdiction.  Dkt. 100.  On February 8, 2021, after discovery, the Developer Affiliates filed a supplemental brief stating that DVCI is non-diverse and arguing for dismissal on that ground.  Dkt. 104 ("Dev. Aff. Supp. Mem.").  On February 18, 2021, TPBC filed a supplemental memorandum opposing such dismissal.  *See* Dkt. 106 ("Pl. Supp. Mem.").  The same day, it also moved to add two additional parties, in a bid to create federal-question jurisdiction should the court find diversity lacking.  Dkt. 108.  On March 3 and 4, 2021, defendants opposed the latter motion.  Dkts. 113–16.  TPBC's time to reply in support of its motion to add parties expired on March 11, 2021, *see* Local Civil Rule 6.1(b), but it did not file any such reply.

## II.    Motion to Dismiss for Lack of Subject-Matter Jurisdiction

The Developer Affiliates have moved to dismiss TPBC's claims, in their entirety, for lack of complete diversity.  The Court first addresses this threshold jurisdictional challenge.

### A.      Legal Standard

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008), *aff'd*, 471 F. App'x 34 (2d Cir. 2012).  Once subject-matter jurisdiction is challenged, a plaintiff "has the burden of proving by a preponderance of the evidence that jurisdiction exists." *Giammatteo v. Newton*, 452 F. App'x 24, 27 (2d Cir. 2011) (citing *Makarova*, 201 F.3d at 113).  In analyzing whether subject matter jurisdiction exists, a district court may consider evidence outside the pleadings, such as affidavits and exhibits.  *See Makarova*, 201 F.3d at 113.

Under 28 U.S.C. § 1332, "diversity jurisdiction exists over civil actions (1) between 'citizens of different States' and (2) between 'citizens of a State and citizens or subjects of a foreign state.'" *Herrick Co., Inc. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322 (2d Cir. 2001) (quoting 28 U.S.C. § 1332).  Diversity jurisdiction "is available only when all adverse parties to a litigation are completely diverse in their citizenships." *Id.*  "Therefore, in a case with multiple defendants, if a single defendant is from the same state as the plaintiff, the district court loses diversity jurisdiction over the entire action." *Phoenix Four, Inc. v. Strategic Rsch. Corp.*, 446 F. Supp. 2d 205, 212 (S.D.N.Y. 2006) (citing *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005)).  For diversity purposes, a corporation "is considered a citizen of the state in which it is incorporated and the state of its principal place of business." *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 48 (2d Cir. 2012).  And a limited liability company ("LLC") "takes the citizenship of each of its members." *Id.* at 49.

"Federal Rule of Civil Procedure 21 allows a court to drop a nondiverse party at any time to preserve diversity jurisdiction, provided the nondiverse party is not 'indispensable' under Rule

15

19(b)." *CP Sols. PTE, Ltd. v. Gen. Elec. Co.*, 553 F.3d 156, 159 (2d Cir. 2009) (citation

omitted). Rule 19(b), as analyzed by the Second Circuit, specifies four factors that a court

should consider in determining whether a party is indispensable:

> (1) whether a judgment rendered in a person's absence might prejudice that person
> or parties to the action, (2) the extent to which any prejudice could be alleviated,
> (3) whether a judgment in the person's absence would be adequate, and (4) whether
> the plaintiff would have an adequate remedy if the court dismissed the suit.

*Id.* The Circuit has further held that "the district court should take a 'flexible approach' under

Rule 19(b) when deciding whether parties are indispensable and that 'very few cases should be

terminated due to the absence of nondiverse parties unless there has been a reasoned

determination that their nonjoinder makes just resolution of the action impossible.'" *Universal*

*Reinsurance Co. v. St. Paul Fire & Marine Ins. Co.*, 312 F.3d 82, 87 (2d Cir. 2002) (quoting

*Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 242 (2d Cir. 1987)). The Circuit thus

disfavors *per se* rules of indispensability, instead directing district courts to make a fact-specific

assessment of a party's importance to an action "in the context of a particular litigation." *Curley*

*v. Brignoli, Curley & Roberts Assocs.*, 915 F.2d 81, 90 (2d Cir. 1990) (quoting *Provident*

*Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 118 (1968)); *see, e.g.*, *CP Sols.*,

553 F.3d at 159 (dismissal for lack of diversity inappropriate where district court "adopted a

bright-line rule that all parties to a contract are indispensable"); *Universal Reinsurance*, 312 F.3d

at 88 (affirming decision to drop party where district court "merely noted that '[w]ell established

precedent holds that "one of several joint obligors is not an indispensable party,"'" but did not

"create[] a per se rule regarding the indispensability of parties who are jointly and severally

liable on a claim," and that the latter approach might "violate[] Rule 19(b)").

### B.      Application

With jurisdictional discovery complete, the parties agree that diversity is lacking because one defendant, DVCI, is not diverse from TPBC.  *See* Nida Decl. ¶ 16.  The Developer Affiliates argue that the action must be dismissed.  TPBC counters that the Court can, and should, salvage its jurisdiction by dismissing DVCI from the case.  The Court, applying the above factors, holds with TPBC, and rejects defendants' claim that this case cannot be resolved without DVCI's participation.

First, little, if any, prejudice would result if this action were to proceed without DVCI. To fund the Project, the Developer obtained four loans.  DVCI, along with five other lenders, partially funded one of those loans, worth $19 million.  SAC ¶ 73 (identifying NMTC Investor, GSNMF, LIIF, DVCI, NMTC Investment Fund, and GW Bridge Fund II).  TPBC seeks (1) to recover funds that DVCI and other lenders improperly received; and (2) a declaration that TPBC's rights and interests are superior to those of the lenders, including DVCI.  *See id.* ¶¶ 85, 94. As to the funds in its possession, DVCI will not suffer a risk of prejudice if it is dismissed; TPBC would simply be unable to recover those amounts.[3]  Nor would the other defendants be liable in any greater proportion should the Court dismiss DVCI; they remain potentially liable solely for any diverted funds in their own possession.[4]  To be sure, *TPBC* may suffer some amount of prejudice from DVCI's absence, but that "is prejudice the plaintiff is willing to bear and therefore should not . . . trouble[] the district court."  *CP Sols.*, 553 F.3d at 159.  And as to the

---

[3] TPBC has confirmed this.  *See* Pl. Supp. Mem. at 5 ("Once it is dismissed from this Action, DVCI faces no risk of liability to TPBC for wrongful diversion of trust assets.").

[4] TPBC has confirmed this, too.  *See* Pl. Supp. Mem. at 5 ("[S]ince TPBC merely seeks an order requiring each Defendant to return the funds received by that Defendant," none of the remaining Defendants "face an increased risk of liability . . . due to the absence of DVCI.").

declaratory claim, DVCI is in exactly the same position as the other Co-Lender Defendants who contributed to the 2013 building loan, and largely the same position as the other Lender Defendants. Those parties retain the same interest in litigating this issue as DVCI, should it remain in the case. Many of those defendants, in fact, have the same counsel as DVCI. *See generally* Co-Lender Mem (on behalf of GSNMF, DVCI, LIIF, NMTC Investment Fund, and NMTC Investor). Any "potential prejudice to an absent party under Rule 19(b) is mitigated where a remaining party 'could champion [its] interest,'" and "approaches the vanishing point when the remaining parties are represented by the same counsel, and when the absent and remaining parties' interests are aligned in all respects." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 134 (2d Cir. 2013) (quoting *CP Sols.*, 553 F.3d at 160); *see Prescription Plan Serv. Corp. v. Franco*, 552 F.2d 493, 497 (2d Cir. 1977) (no prejudice to dropped parties, as "counsel for those remaining in the case will be no less vigorous in their advocacy because they represent two fewer persons"). The Developer Affiliates do not identify any prejudice to them or any other party that would result from DVCI's dismissal.[5] Thus, the first factor strongly favors dismissing DVCI to preserve the Court's subject-matter jurisdiction.

---

[5] The Developer Affiliates take a rigid approach to this question, arguing that DVCI is indispensable because it falls into certain categories that typically are considered indispensable. For example, they argue that "parties with rights affected by contract are generally indispensable parties," and that, because DVCI is a party to the 2013 building-loan agreement, it cannot be dropped. *See* Def. Supp. Mem. at 5; Dkt. 114 at 8–9; *see also id.* ("Count II seeks to have the Court determine that under the Ground Lease TP's right to monies related to the Project is legally superior to DVCI's right to those same monies. *Ipso facto*, DVCI is an indispensable party to this determination."). That approach is foreclosed by Second Circuit precedent. *See CP Sols.*, 553 F.3d at 159 (reversing dismissal for lack of diversity where district court "adopted a bright-line rule that all parties to a contract are indispensable"); *Curley*, 915 F.2d at 90 (requiring a fact-specific assessment in "the context of a particular litigation"). In any event, the cases on which the Developer Affiliates rely are factually afield. In one, plaintiff sought to impose a constructive trust on funds held by the party in question, even in its absence. *See Allen ex rel. Allen v. Devine*, 726 F. Supp. 2d 240, 257 (E.D.N.Y. 2010). Here, TPBC has disavowed seeking

As a result, as to the second factor, there is little to no prejudice to mitigate. This factor also supports dismissing DVCI.

Third, there appears little risk that the adequacy of any judgment here would be jeopardized absent DVCI's participation. "[A]dequacy refers to the 'public stake in settling disputes by wholes, whenever possible.'" *CP Sols.*, 553 F.3d at 160 (quoting *Republic of Philippines v. Pimentel*, 553 U.S. 851, 870 (2008)). As to the declaratory judgment claim, any resolution of the issues presented would settle the question for all parties, whether or not active litigants. As to the claim for diverted Article 3-A trust funds, there is a possibility that, after this litigation concludes,[6] TPBC could, in a successive action, pursue DVCI for what it contends are ill-gotten trust funds. Given that DVCI is only one of nearly 20 entities (setting aside the Doe parties) who is alleged to have received diverted funds, that risk appears low. However, without concrete data as to the amount of funds in DVCI's possession as a proportion of the allegedly diverted assets, the Court cannot assess with certainty the likelihood of a follow-on DVCI-specific action. With the possibility of piecemeal litigation only theoretical, this factor does not disfavor dismissal.

---

that remedy or, through this litigation, the return of any funds in DVCI's possession. *See supra* note 3. In the other, the indispensable party had issued every one of the many insurance policies at issue, "and the central dispute [was] whether [that party] breached the terms and conditions of its disability policies." *Rubler v. Unum Provident Corp.*, No. 04 Civ. 7102 (DC), 2007 WL 188024, at *2 (S.D.N.Y. Jan. 25, 2007). It did not hold that any party with an interest in a contract to be interpreted is *ipso facto* indispensable. Beyond these sweeping but errant claims, the Developer Affiliates do not offer any substantive argument why DVCI's dismissal would be prejudicial, or otherwise impair the prosecution of this litigation. *See generally* Dkt. 114.

[6] Only one action to recover the funds of a particular Article 3-A trust may proceed at one time. *See* N.Y. Lien Law § 77(2).

The last factor—the availability of an adequate remedy in an alternative forum if the suit is dismissed—appears to favor keeping DVCI in this case. Were the case to be dismissed for lack of diversity jurisdiction, TPBC would remain free to re-file it, against all defendants, in New York State court.[7]

Considering the factors together, DVCI cannot, in "equity and good conscience," be considered an indispensable party, so as to require—at the expense of this entire lawsuit—its joinder. *Universal Reinsurance*, 312 F.3d at 87 (quoting Fed. R. Civ. P. 19(b)). To be sure, there is a theoretical possibility that, were TPBC to pursue DVCI in a separate action, piecemeal litigation would result from its dismissal here. And TPBC has not identified a good reason why this litigation, which entails only state-law claims, could not viably proceed in state court. But, absent any likely prejudice to any party from DVCI's dismissal, and given the small risk of successive lawsuits, the Court holds that DVCI is not indispensable. The Court therefore dismisses DVCI from this action. With it excised, the parties are diverse, and the Court has subject-matter jurisdiction over all of TPBC's claims.[8]

---

[7] TPBC vaguely asserts that, had the Project been completed over one year ago, TPBC would be barred from filing in state court by Article 3-A's one-year statute of limitations, which runs from the later of a project's completion or the date on which a contractor's payment came due. *See* N.Y. Lien Law § 77(2). TPBC has not, however, presented evidence that the Project was, in fact, completed. *See* SAC ¶ 33. The Court puts this argument aside.

[8] Given this holding, the Court has no occasion to entertain TPBC's alternative bid—made in the midst of briefing this motion—to salvage jurisdiction: by joining new defendants to establish jurisdiction under the Edge Act, 12 U.S.C. § 632. *See* Dkt. 108; Pl. Supp. Mem. at 2–3. The Court denies TPBC's motion to add such defendants, whose presence is unnecessary and whose post-discovery joinder would be highly disruptive.

The Court also rejects the Developer Affiliates' argument that the Court should decline to drop DVCI and dismiss this entire action for want of subject-matter jurisdiction because "the Court's loss of subject matter jurisdiction is likely inevitable." Def. Supp. Mem. at 6–7. In the event that the joinder of additional Lien Law beneficiaries becomes necessary later in this case,

**III.     Motions to Dismiss for Failure to State a Claim**

The Court next turns to the motions to dismiss under Rule 12(b)(6).  Each defendant has

moved to dismiss all claims against it.

All argue that the Court should dismiss TPBC's Lien Law claims because TPBC has

failed to pursue this case as a representative action or join all potential beneficiaries as parties, as

the Lien Law requires.

The Developer Affiliates separately argue that TPBC has failed to allege that they

diverted any trust funds of which TPBC was a beneficiary, or to adequately allege its claims for

conversion or constructive fraud.

The Lender Defendants argue that TPBC has failed to plausibly allege that they either

received any Article 3-A funds or, if they did, that they knew the funds they received were

subject to an Article 3-A trust.  They also contend that TPBC's request for declaratory relief has

been preempted by a decision of the bankruptcy court in the Developer's bankruptcy proceeding.

After setting forth the applicable legal standards, the Court addresses each argument in

turn.  The Court holds that (1) TPBC has plausibly pled its claims, except for its fraud claim,

against the Developer Affiliates, but (2) TPBC's claims against the Lender Defendants, both

under the Lien Law and the Declaratory Judgment Act, must be dismissed.

**A.     Applicable Legal Standards**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual

_____

as the Defendant Affiliates posit, the Court will take up at that time the implications of such as
development.

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff.  *See Koch*, 699 F.3d at 145.  That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### B.    Lien Law Claims

#### 1.    Applicable Legal Principles

New York's Lien Law provides special protections, through the automatic establishment of statutorily protected trust funds, to ensure payment of contractors and laborers on construction projects.  "Article 3-A of the Lien Law creates 'trust funds out of certain construction payments or funds to assure payment of subcontractors, suppliers, architects, engineers, laborers, as well as specified taxes and expenses of construction.'" *Aspro Mech. Contracting, Inc. v. Fleet Bank*, 1 N.Y.3d 324, 328 (2004) (quoting *Caristo Constr. Corp. v. Diners Fin. Corp.*, 21 N.Y.2d 507, 512 (1968)).  It is "designed to protect subcontractors, tax collectors, and parties who expend labor or extend financing in construction projects, by impressing with a trust any funds paid to a contractor or received by an owner in connection with an improvement of real property in the state." *Interworks Sys., Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 695 (2d Cir. 2010); *see LeChase Data/Telecom Servs., LLC v. Goebert*, 6 N.Y.3d 281, 289 (2006) ("[T]he primary purpose of article 3-A . . . [is] to ensure that those who have directly expended labor and materials to improve real property [or a public improvement] at the direction of the owner or a general contractor receive payment for the work actually performed." (citation omitted)).

22

An Article 3-A trust "arises automatically by operation of law when fees are paid to the contractor or received by the owner in connection with an improvement of real property" or a public improvement. *Interworks*, 604 F.3d at 695. "Until all trust fund beneficiaries have been satisfied, it is an unlawful diversion of trust fund assets for the contractor or owner to use any of the trust fund assets for any purpose other than satisfying the claims of beneficiaries." *Id.* "If the contractor or owner unlawfully diverts the trust assets before a trust beneficiary is satisfied, that beneficiary may recover the trust assets from anyone who has received the assets with knowledge of their trust status." *Id.* (citing N.Y. Lien Law § 77(1), 77(3)(a)(vi)). Liability under Article 3-A extends to the "officers and directors of a corporate trustee," and, if they "cause the corporation to misappropriate trust property," they "will be personally liable for participation in a breach of trust." *Atlas Bldg. Sys., Inc. v. Rende*, 236 A.D.2d 494, 495 (2d Dep't 1997).

Any action to recover diverted funds under the Lien Law must "conform as nearly as may be to the [procedures] in a class action," although, under New York law, courts have discretion to waive the numerosity requirement of state law. N.Y. Lien Law § 77(1); *see Jorge v. Piola Prop. Mgmt. LLC*, Index No. 603127/17, 2017 WL 2723466, at *4 (N.Y. Sup. Ct. June 23, 2017) (action to enforce Article 3-A trust "must be brought as a class action."). This requirement is "aimed at safeguarding an equitable pro rata distribution of the funds to all suppliers of material and labor who have improved the real property." *Quantum Corp. Funding, Inc. v. Bast Hatfield, Inc.*, No. 5:04 Civ. 137 (FJS), 2005 WL 1926610, at *6 (N.D.N.Y. June 8, 2005) (citation omitted). "Since the requirement of a representative action is integral to Article 3-A's general purpose, before a court can enforce an Article 3-A trust, it must have before it all potential trust beneficiaries." *Id.* Moreover, no more than one action to recover the funds of a particular Article 3-A trust may proceed at the same time. *See* N.Y. Lien Law § 77(2). Together, these

23

two procedural requirements serve important goals.  They ensure that all claims arising from a project, which may involve a bevy of aggrieved contractors, subcontractors, and other trust beneficiaries, orderly proceed, in a unified fashion, in the same forum.  They prevent potentially inconsistent adjudications over the same trust corpus.  And they prevent proactive beneficiaries from racing to the courthouse to lay claim to limited funds, while leaving less enterprising beneficiaries without relief.

### 2. Application

#### a. *The SAC's Failure to Plead Class Claims Does Not Warrant Dismissal at This Point*

All the defendants challenge whether TPBC has properly brought this lawsuit as a representative action, as the Lien Law requires.  Section 77(1) states:

> A trust arising under this article may be enforced by the holder of any trust claim, . . . in a representative action brought for the benefit of all beneficiaries of the trust. . . .  In any such action, except as otherwise provided in this article, the practice, pleadings, forms and procedure shall conform as nearly as may be to [those] in a class action as provided in article nine of the civil practice law and rules; provided, however, that in determining whether the prerequisites of a class action have been satisfied, the [numerosity requirement] may be waived at the discretion of the court.

As the parties agree, section 77(1) thus mandates that any action to enforce an Article 3-A trust—whether brought in state or federal court—proceed for the benefit of all beneficiaries, as the requirement of an action for common benefit is "integral" to the statutory scheme reviewed above.  *Quantum*, 2005 WL 1926610, at *7; *see* Dev. Aff. Mem. at 17–18; Lender Mem. at 13–15; Pl. Lender Opp'n at 14; *Int'l Brotherhood of Elec. Workers Local Union No. 1249 Pension & Ins. Funds v. S. Buffalo Elec., Inc.* ("*IBEW*"), No. 15 Civ. 682 (MAD), 2017 WL 2483811, at *4 (N.D.N.Y. June 8, 2017) (applying class-action requirement in federal court); *cf. Interworks*, 604 F.3d at 699 (holding that the "requirement that there be no prior pending Article 3-A action" applies in federal court, and, for the same reasons, "it would appear that [the plaintiff] is also

24

bound by the 'representative capacity' requirement of Article 3-A, as the district court held," but declining to reach the latter question).  That rule makes good sense:  It ensures that Article 3-A plaintiffs do not undermine potentially competing trust beneficiaries by bringing an action solely for their own benefit.

Generally, courts applying section 77(1) have thus required plaintiffs to pursue Article 3-A claims as class actions.  But if the plaintiff is the sole beneficiary of the trust, or all such beneficiaries are joined as named parties, both federal and state courts have, in more flexible fashion, allowed Article 3-A cases to go forward without requiring full-blown class proceedings. *See, e.g.*, *In re Westchester Structures, Inc.*, 181 B.R. 730, 737–38 (Bankr. S.D.N.Y. 1995); *Syro Steel Co. v. Mellon Bank E. P.S.F.S. Nat'l Ass'n*, No. 90 Civ. 1321, 1993 WL 173439, at *2 (N.D.N.Y. May 17, 1993) ("If plaintiff could demonstrate that it is the only beneficiary then it could proceed."); *Callender v. Shirell Air, Inc.*, 282 A.D.2d 564, 565 (2d Dep't 2001) (allowing plaintiffs to proceed under Article 3-A because plaintiffs, "as the only members of the proposed class, can adequately protect the rights of all members of the class"); *see also Quantum*, 2005 WL 1926610, at *7 (all section 77(1) requires is that "all potential trust beneficiaries are joined in [the] action," either through a class action or as named parties).  The critical requirement is that the Court "must have before it all potential trust beneficiaries." *Quantum*, 2005 WL 1926610, at *6.  On this point, too, the parties appear to agree.

The parties dispute, however, how these state-law representative-action requirements map onto federal standards for pleading and certifying class actions.  Defendants argue that, even though this requirement originates in state law, federal class action rules apply under *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).  They thus contend that, because the SAC fails either to plead the standards for class certification set by Federal Rule of Civil Procedure 23, or to join the other

beneficiaries that it admits exist, TPBC has not met the representative-action requirement and its Lien Law claim should be dismissed.

TPBC responds that Rule 23 does not apply because section 77(1) requires only that Article 3-A proceedings "shall conform as nearly as may be" to state-law class-action procedures, and even permits courts to excuse noncompliance with the numerosity requirement in New York's class-action rule. Depriving TPBC of the benefit of these more flexible procedures, it contends, would frustrate the purposes of the Lien Law. It also contends that, whatever framework applies, it has sufficiently pled its case as a class action.

The Court holds with TPBC, but only on the second point. As to the first, the Court agrees with defendants that, ultimately, TPBC must either pursue this action as a class action under Rule 23 or join all beneficiaries in the case. Otherwise, its Lien Law claim must be dismissed. *See Syro Steel*, 1993 WL 173439, at *2 (dismissing Article 3-A proceeding after denying class certification for lack of numerosity and typicality, where plaintiff could not join non-diverse beneficiaries). TPBC has chosen to bring this case in federal court, despite bringing solely New York claims against an original cast of non-diverse defendants. When a federal court sits in diversity jurisdiction, federal procedural requirements, including those of Rule 23, control. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010). That is so even where those requirements conflict with those of state law. *See id.* at 411. And federal courts assessing Article 3-A claims under New York's Lien Law have, nearly uniformly, held that Rule 23, not state law, governs class certification in Article 3-A actions. *See Quantum*, 2005 WL 1926610, at *7 (collecting cases); *U.S. Fid. & Guar. Co. v. Madison Fin. Corp.*, No. 01 Civ. 3998 (CM), 2002 WL 31731020, *3–5 (S.D.N.Y. Dec. 4, 2002) (applying Rule 23 requirements to Article 3-A claim and denying class certification); *Universal Maint., Inc. v.*

*Amherst Painting, Inc.*, No. 94 Civ. 0875 , 1995 WL 737927, at *4 n.4 (W.D.N.Y. Dec. 7, 1995) ("In light of *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), this Court applies [Rule] 23 in the stead of the similar state law requirements of Lien Law § 77 and CPLR Art. 9."); *Syro Steel*, 1993 WL 173439, at *2.  TPBC has not cited any federal case excusing an Article 3-A plaintiff from meeting Rule 23's full suite of requirements, or assessing class certification—in any context—under state, rather than federal law.  Rule 23, not state law, applies to this action.

But critically, this case is at the pleading stage.  There is not a motion for class certification under review.  The Court holds, in agreement with TPBC, that the SAC is pled in compliance with section 77(1).  TPBC brings this action "on behalf of all beneficiaries of the Article 3-A Trust created in connection with the Project."  *See* SAC ¶ 82.  It claims that it has sued "in its representative capacity . . . for the benefit of all beneficiaries or class members of said trust."  *Id.* ¶ 1.  And it seeks relief on behalf of all those beneficiaries.  *Id.* ¶ 85.  In its opposition, TPBC confirms that, after identifying all potential beneficiaries through discovery, it will "either move to certify the class [or] join them in the action."  Pl. Dev. Opp'n at 18.  TPBC has thus brought this case in a representative fashion, for the benefit of all beneficiaries who might have an interest this litigation.  At the pleading stage, that is all that is required.  *See, e.g.*, *Jorge*, 2017 WL 2723466, at *4 ("[T]he Court will not dismiss the claim at the pleading stage . . . .  Although it agrees with the defendants that facts regarding a class are absent . . . , the statutory constraint on plaintiff should not cause dismissal when sufficient facts are pled regarding the plaintiff's own right to seek relief under Lien Law article 3-A."); *see also ADCO Elec. Corp. v. McMahon*, 38 A.D.3d 805, 806–07 (2d Dep't 2007) (collecting cases holding that failure to plead class claims "is not fatal, and may be cured," and allowing plaintiff to move for class

certification).[9]  Indeed, New York courts have allowed parties to cure the failure to bring class

claims at much later stages in the litigation.  *See, e.g.*, *Scriven v. Maple Knoll Apartments, Inc.*,

46 A.D.2d 210, 215 (1974) (remanding, post-trial, for plaintiff to ensure that all trust

beneficiaries receive relief).  Defendants cite one case that dismissed Lien Law claims for failure

to plead class claims, but there, the amended complaint did not even refer to other beneficiaries,

let alone purport to pursue relief on their behalf.  *See IBEW*, No. 5:15 Civ. 682, Dkt. 36 (N.D.N.Y.

filed Nov. 14, 2016); *id.*, 2017 WL 2483811, at *4.  Accordingly, the Court will not dismiss

TPBC's Lien Law claims for failure to pursue the action in a representative capacity.

That said, to ultimately secure relief on its Lien Law claim, TPBC must, as stated above,

either satisfy Rule 23 or join all beneficiaries.  That means that it must show, *inter alia*, the

potential beneficiaries to be so numerous that their joinder is impracticable, *see* Fed. R. Civ.

P. 23(a)(1),[10] or that their joinder is possible without destroying the Court's subject-matter

jurisdiction.  *See Syro Steel*, 1993 WL 173439, at *2 ("If these parties cannot be joined here in

federal court because they will destroy diversity, then the action simply cannot proceed here.").

If TPBC cannot do so, it cannot maintain this action in this Court.  The Court thus intends for

this case to move expeditiously to class discovery, aimed—as TPBC suggests—at identifying

---

[9] To the extent that defendants argue that TPBC's allegations about the potential class fail to satisfy Rule 23, that challenge is properly resolved at the class-certification stage.  *See, e.g.*, *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 220 (S.D.N.Y. 2019) ("Whether a plaintiff can satisfy the requirements of Rule 23 are more properly decided on a class certification motion.").  A motion for class certification may be, and generally is, supported by evidence beyond the allegations set forth in a complaint.

[10] Even were the Court able to waive Rule 23's numerosity requirement, as a New York court applying state law could do, it would not expect to do, as such would permit TPBC to effect an end-run around the limits of the Court's diversity jurisdiction.

trust beneficiaries, and then to class certification (if TPBC has a basis to so move).  But for now, defendants' motions to dismiss for failure to plead a representative action are denied.

> b.   *The SAC Plausibly Alleges the Developer Affiliates' Diversion of Article 3-A Trust Assets of Which TPBC Is a Beneficiary*

The Court next addresses the arguments raised by each group of defendants, beginning with the Developer Affiliates.  They argue that any funds they diverted are not, as pled, Lien Law funds to which TPBC was entitled.  The Court holds otherwise.  Because the Developer Affiliates' argument on this point is technical, and depends on a nuanced grasp of the trusts that the Lien law permits to be established, the Court first reviews the applicable provisions in detail.

The Lien Law recognizes three types of entities, each of which may become a trustee or beneficiary of Article 3-A trust assets: owners, contractors, and subcontractors.  An owner includes "the owner in fee of real property," or "a lessee for a term of years."  N.Y. Lien Law § 2(3).  A contractor is "a person who enters into a contract with the owner of real property for the improvement thereof, or with the state or a public corporation for a public improvement."  *Id.* § 2(9).  A subcontractor is someone who "enters into a contract with a contractor and/or with a subcontractor for the improvement of such real property or such public improvement."  *Id.* § 2(10).

Any funds received by an owner for use in connection with a construction project become "a separate trust," of which the owner is trustee (an owner trust).  *Id.* § 70(2).  So, too, with funds received by a contractor or a subcontractor.  Funds received by a contractor become a part of a contractor trust, of which the contractor is trustee, for the benefit of the contractor's subcontractors.  And funds received by a subcontractor become part of a subcontractor trust, of which the subcontractor is trustee, for the benefit of the subcontractor's subcontractors.  *See id.*  The assets of each trust "shall be held and applied for payment of the cost of improvement."  *Id.* § 71(1).  Such application "may be enforced by the holder of any trust claim."  *Id.* § 77(1).

In certain contexts, however, Article 3-A forecloses the creation of an owner trust. Section 70(1) of the Lien Law distinguishes between "improvements of real property" and "public improvements," which are mutually exclusive. *See Tri-City Elec. Co. v. People*, 96 A.D.2d 146, 152 (4th Dep't 1983), *aff'd*, 63 N.Y.2d 969 (1984). A public improvement is "an improvement of any real property belonging to the state or a public corporation." N.Y. Lien Law § 2(7). An improvement of real property is "any improvement of real property not belonging to the state or a public corporation." *Id.* § 2(8). For public improvements, Article 3-A exempts funds held by an owner—which typically would be a municipality or other public entity—from trust status. *See Tri-City*, 96 A.D.2d at 152 ("Dealing with public improvements, the statute renders the trust provisions applicable to funds received: (a) by a contractor in connection with a contract; or (b) a subcontractor under, or in connection with, a subcontract made with a contractor for such public improvement."); *Canron Corp. v. City of New York*, 214 A.D.2d 115, 120 (1st Dep't 1995) (where diversion claims relate to "a contract for a public improvement," Article 3-A "impresses a trust only upon funds received by the contractor and not upon those received by" the owner of public property).

Here, a New York State court has already held, and all parties agree, that the Project was a "public improvement," not an improvement of real property, because Port Authority was the fee owner of the property—even though the Developer held a private leasehold in it. *See George Wash. Bridge Bus Station Dev. Venture, LLC v. Associated Specialty Contracting, Inc.*, 149 A.D.3d 525, 526 (1st Dep't 2017) ("[T]he George Washington Bridge Bus Station constituted a 'public improvement' within the meaning of the Lien Law, despite petitioner's private leasehold interest in the property," because Port Authority owned it). Thus, there can be no owner trust here. There can only be contractor trusts and subcontractor trusts.

Generally, the only beneficiaries of an Article 3-A trust are those in direct contractual privity with the trustee. Thus, an owner, who is trustee of an owner trust, is a guarantor of payment only to the contractor with whom it has an agreement, not to the subcontractors with home the contractor is in privity. *See, e.g.*, *Quantum Corp. Funding Ltd. v. L.P.G. Assocs., Inc.*, 246 A.D.2d 320, 322 (1st Dep't 1998) ("[T]he statute does not make the owner a guarantor of payment to the creditors of the contractor." (citation omitted)); *Engineered Air, a Div. of Thermal Components, Inc. v. LeCesse Bros. Contracting*, 192 A.D.2d 1053, 1055 (1993) (Boomer, J., concurring) ("There was no legislative intent to make an owner a guarantor of payment to the creditors of his contractor."). Similarly, a contractor is not liable for a subcontractor's nonpayment of the bills of its subcontractor. *See Onondaga Com. Dry Wall Corp. v. Sylvan Gen. Co.*, 26 A.D.2d 130, 133 (1st Dep't 1966) (rejecting claim that "once an owner pays moneys to a contractor pursuant to the provisions of a contract for improvement of realty he becomes a cotrustee or fiscal manager of the fund with the obligation to make certain that the fund is disbursed to those entitled thereto"), *aff'd*, 21 N.Y.2d 739 (1968); *see also Merrill Iron & Steel, Inc. v. Yonkers Contracting Co.*, No. 05 Civ. 5042 (WHP), 2006 WL 2679940, at *9 (S.D.N.Y. Sept. 19, 2006) (noting lack of Court of Appeals guidance about whether "a general contractor's fiduciary duties under Article 3-A extend to second-tier contractors . . . who lack contractual assurances of direct payment from the general contractor," but concluding that the weight of authority holds that they do not).

With those principles in place, the Developer Affiliates argue as follows. First, drawing on the above line of cases prohibiting those down the chain from a trustee from suing the trustee under Article 3-A, they contend that New York law forbids "dual beneficiary status"—that is, a single party laying claim to two separate Article 3-A trusts on the same project. In other words,

31

they contend that a party can be a beneficiary of an owner trust or a contractor trust, but not both

at the same time.  Second, they argue that the allegations in the SAC plead only that the

Developer was an owner, not a contractor, and that TPBC was its contractor, not a subcontractor.

Third, they argue that, since there can be no owner trust on a public improvement, TPBC (as a

contractor that can only lay claim to an owner trust) cannot allege that the Developer was trustee

of any trust of which TPBC was a beneficiary.

This argument is easily set aside.  That is because New York courts have rejected it in

largely identical circumstances.  First, whatever the availability of "dual beneficiary" status, New

York courts have recognized that the same entity can be both an owner and a contractor.  *See*

*Burns Elec. Co. v. Walton St. Assoc.*, 136 A.D.2d 291, 295 (4th Dep't), *aff'd*, 73 N.Y.2d 738

(1988) ("There is nothing contradictory about an owner also being a contractor.  It is common

for an owner to enter into a series of contracts for improvement of his property thereby acting as

a general contractor.").  Often, that determination arises where the owner is a public entity,

which—as here—leases property to a private firm for its development.  For example, in *Burns*,

Walton Street Associates ("Walton") contracted with a public corporation, the Syracuse Industrial

Development Agency ("SIDA") to improve SIDA's properties and, in exchange, become vendee

in possession of those properties.  Walton contracted with Burns Electric Co. ("Burns") to

provide work on several properties, but never paid Burns.  *Id.* at 292.  Burns brought an Article

3-A proceeding against Walton, and Walton defended that it was an owner, not a contractor,

given its property interest in the properties, and that it therefore was not a statutory trustee of any

Lien Law funds.  *Id.* at 292–95.  The Appellate Division rejected that argument as "fallacious,"

and held that because "we must look not to the terms by which the parties refer to themselves,

but rather to all of the facts constituting the relationship," Walton should be treated as both a

32

contractor and an owner, Burns as its subcontractor, and Burns as entitled to "the relief afforded an unpaid worker under the trust provisions of the Lien Law." *Id.* at 295.

The Appellate Division addressed similar circumstances in *Canron Corp. v. City of New York*, 214 A.D.2d at 120.  There, the City owned a marine terminal, which it rented to Northeast Marine Terminal Co. ("Northeast").  After two cranes were damaged, the City retained Northeast to oversee the necessary repairs at the terminal.  Northeast, in turn, retained the plaintiff, Canron, to perform the "bulk of the work." *Id.* at 117.  Although Northeast paid Canron for most of its work, after Northeast filed for bankruptcy, it directed the City to place the final check owed to it from the City into a segregated account to be applied toward Northeast's rent arrears to the City. *Id.*  Canron sued, alleging that such use of the check—which had been intended for Canron, and was the subject of an Article 3-A trust—was an unlawful diversion of trust assets under the Lien Law.  The trial court determined that "although Northeast is an 'owner' pursuant to Lien Law § 2(3), as the party engaged to undertake the repairs, it is also a contractor pursuant to section 2(9) of the statute," and therefore could be liable for the diversion of trust assets. *Id.* at 118.

Trial courts in New York have applied these decisions to hold that a lessee of real property from a public entity can be both an owner and a contractor, so long as the lessee meets the definition of "contractor" under the Lien Law. *See, e.g.*, *Gilbane Bldg. Co. v. N.Y. Wheel LLC*, Index No. 151051/2019, 2020 WL 466088, at *5–7 (N.Y. Sup. Ct. Jan. 28, 2020) (citing *Canron* and *Burns* to hold that the defendant "is both an 'owner' and 'contractor' for purposes of the Lien Law" where City leased property to defendant, who retained plaintiff to do work on a Ferris wheel on property); *In re OTG JFK T5 Venture, LLC v. IBEX Constr., LLC*, Index No. 115994/08, 2009 WL 2855776, at *5 (N.Y. Sup. Ct. Aug. 11, 2009) (similar).

Thus, whether or not TPBC could theoretically be, at once, a "dual beneficiary" of an owner trust and a contractor trust, that question is irrelevant. All agree there is no owner trust, given the Project being a public improvement. The issue is simply whether the Developer, along with being an owner through its leasehold interest in the Property, qualified as a contractor, and whether TPBC qualified as its subcontractor. If so, then under the above cases, TPBC was the beneficiary of an Article 3-A contractor trust, of which the Developer was the trustee.

That is clearly the case. First, the Developer easily fits the statutory definition of contractor. It "enter[ed]into a contract with . . . the state or a public corporation for a public improvement." N.Y. Lien Law § 2(3). The Project has already been held a public improvement, and the Developer undisputedly contracted Port Authority for that public improvement.

The Developer Affiliates argue that the SAC's allegations are inconsistent with TPBC's argument that Developer is a contractor, rather than solely an owner. But that is wrong. In so arguing, the Developer Affiliates rely on *McNulty Bros. v. Offerman*, a 1917 case that interpreted an earlier, and substantially different, definition of "contractor" under the Lien Law. 221 N.Y. 98, 105 (1917) (Cardozo, J.).[11] The Court of Appeals held there that "[t]he contractor whom the Lien Law has in view is one who would be so characterized in the common speech of men. He is one who, in the usual course of trade, has undertaken to improve the property of another." *Id.* It further held that the plaintiff, who had rented a department store building from the defendant landlord, which had agreed to contribute $15,000 toward unspecified improvement, was not a contractor because "[t]here was only the most general description of the improvements," there

---

[11] The definition of contractor at the time was "a person who enters into a contract with the owner of real property for the improvement thereof." *McNulty*, 221 N.Y. at 104 (quoting N.Y. Lien Law § 2). Given this textual divergence, it is doubtful that *McNulty*'s holding could overcome the above statutory provision if the two conflicted. As explained, however, here the Developer falls even within *McNulty*'s narrower definition of "contractor."

were "no specifications controlling the manner of performance," and there was "merely a promise to contribute a lump sum to an indefinite and unknown venture." *Id.* at 106.

Here, however, the Developer's relation to the Port Authority made it a contractor, as pled. *See* SAC ¶ 29 (Developer was "ground lessee and developer/contractor"). The Developer received $53 million directly from the Port Authority. Under the Ground Lease, it was to perform "all work required to redevelop the" Property and "all work required to construct the public areas of the Leased Premises, including without limitation all Common Areas." *Id.* ¶ 31(b). It was to do so pursuant to "Stage I Conformed Documents," prepared under a prior agreement between the Developer and the Port Authority, and to receive the Port Authority's approval for other "working drawings, specifications, calculations, product samples and other design materials," which would become the "Approved Construction Documents." *Id.* ¶ 31(a). And the Port Authority retained control over the Project throughout—its approval was necessary to modify any construction documents, engage any contractor or subcontractor, approve personnel access to the construction site, monitor and inspect the construction site, and more. *Id.* ¶ 31(d). The Developer's role was far beyond that of a simple tenant, who agreed to undertake certain improvements at its landlord's partial expense. "[C]haracterized in . . . common speech," and as pled in the SAC, the Developer was the Port Authority's contractor. *McNulty*, 221 N.Y. at 105; *see also OTG JFK*, 2009 WL 2855776, at *4 (JetBlue, despite also being lessee, "had contracted with the Port Authority to be responsible for, among other things, project design and construction at Terminal 5," and was therefore a "'contractor' within the meaning of section 2(9)").

Second, because, with the Construction Contract, TPBC contracted with the Developer (a contractor), it was the Developer's subcontractor. *See* N.Y. Lien Law § 2(10) (a subcontractor is a person who "enters into a contract with a contractor and/or with a subcontractor for the

35

improvement of such real property or such public improvement.").  The Developer Affiliates resist this straightforward application of the law, arguing that the SAC fails to plead these facts, and that the SAC's characterization of TPBC as a "general contractor" forecloses its claim to have been the Developer's subcontractor.  *See* Dev. Aff. Reply at 7–9.  But the facts recited above are pled directly in the SAC.  And the term "general contractor" has no legal significance under the Lien Law.  *See generally* N.Y. Lien Law §§ 2, 70–77.  And, in any event, under that law, courts "look not to the terms by which the parties refer to themselves, but rather to all of the facts constituting the relationship."  *Burns*, 136 A.D.2d at 295.[12]

Here, the facts pled plausibly support that the Developer was an owner and a contractor, *see* SAC ¶ 29; that it was the trustee of a contractor trust under Article 3-A of the Lien Law, *see id.* ¶¶ 31, 115–17; that TPBC was a subcontractor of the Developer, *see id.* ¶ 32; and that, by diverting funds from the contractor trust to its owners and others, the Developer, through the Developer Affiliates, violated its obligations to the beneficiaries of that trust, including TPBC, *see id.* ¶ 79.  Accordingly, the Court will deny the Developer Affiliates' motion to dismiss TPBC's claims for diversion of trust assets under Article 3-A of the lien law.

---

[12] The Developer Affiliates' argument that TPBC "is bound to its judicial admission that its relationship with Developer is one of Owner-Contractor" is meritless.  *See* Dev. Aff. Reply at 8–9. The SAC did not plead that.  Instead, it pled that the Developer was a "contractor" and that TPBC entered into a contract with it.  *See* SAC ¶¶ 29, 32.  That makes it a subcontractor under the Lien Law.  *See* N.Y. Lien Law § 2(10).  To be sure, TPBC did describe itself as a "general contractor" in pleading its claim for a declaratory judgment.  *See* SAC ¶ 91.  But that was outside the Lien Law discussion, and does not bespeak a broader intent to plead that TPBC was a contractor, as opposed to a subcontractor.  Moreover, as stated, "general contractor" is not a recognized term under the Lien Law.  TPBC's being such is not inherently inconsistent with its being a subcontractor.

c.     *The SAC Does Not Plausibly Plead the Lender Defendants'*
       *Knowing Receipt of Article 3-A Trust Funds*

The Court, however, agrees with the Lender Defendants that dismissal of the Lien Law

claims against them is required.  That is because TPBC has not plausibly alleged that the lenders

received unlawfully diverted trust funds *with knowledge* that the funds were trust assets.

The Lien Law permits beneficiaries of an Article 3-A trust to recover trust assets from the

recipients of diverted assets, but only in certain circumstances.  The section authorizing such

recovery states:

> Where the holder of any trust assets is a trustee or *a transferee who received the
> assets with the knowledge that they were trust funds*, an order for distribution and
> retention for future distribution of any trust assets shall include the amount of
> diverted funds plus interest from the time of the diversion to the date of such order.

N.Y. Lien Law § 77(3)(a)(vi) (emphasis added).  And another section of the law, titled

"Diversion of Trust Funds," provides that "[n]othing in this article affects the rights of a holder in

due course of a negotiable instrument or of a purchaser in good faith for value *and without notice*

*that a transfer to him is a diversion of trust assets*."  *Id.* § 72(1) (emphasis added).

Thus, under Article 3-A, "a trust beneficiary may enforce its rights against any

nonbeneficiary who receives trust assets," but only if the nonbeneficiary received those assets

"with knowledge of their trust status."  *Canron Corp. v. City of New York*, 89 N.Y.2d 147, 154

(1996); *see Interworks*, 604 F.3d at 696 (beneficiaries "may recover the trust assets from anyone

who has received the assets with knowledge of their trust status"); *LeChase*, 6 N.Y.3d at 289

("Section 77 authorizes a trust beneficiary to recover trust assets from anyone to whom they have

been diverted with notice of their trust status."); *see also Colonia Ins. Co. v. United States*, No. 95

Civ. 2882, 1996 WL 68533 (CPS), at *4 (E.D.N.Y. Jan. 25, 1996) ("New York courts have

interpreted this provision to require a plaintiff to show subjective, not objective, notice.").

The Lender Defendants point out, rightly, that the SAC *nowhere* alleges that they had any knowledge—actual, constructive, objective, or subjective—that the funds they allegedly received from the Developer were assets of an Article 3-A trust.  The parties' dispute on this issue thus largely comes down to the allocation of pleading burdens.  TPBC argues that its claim against the Lender Defendants survives because knowledge of assets' trust status is not an element of its claim.  Instead, *lack* of knowledge, it contends, is an affirmative defense to a claim against a transferee under the Lien Law, and so the burden of pleading and proving that lack rests with defendants.  *See, e.g.*, *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ("Since qualified immunity is a defense, the burden of pleading it rests with the defendant."); *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007) ("The pleading requirements in the Federal Rules of Civil Procedure . . . do not compel a litigant to anticipate potential affirmative defenses . . . and to affirmatively plead facts in avoidance of such defenses.").

The Court holds, with the Lender Defendants, that a recipient's knowledge of funds' trust status is an element of plaintiffs' claim, not an affirmative defense.  The weight of authority suggests that, to recover from a transferee of Article 3-A trust funds, a plaintiff must show that the transferee knew the funds it had received were assets of a trust asset.  *See, e.g.*, *Colonia*, 1996 WL 68533, at *4 ("New York courts have interpreted this provision to r*equire a plaintiff to show subjective, not objective, notice*."); *id.* ("The complaint, however, alleges sufficient facts to support a finding that [defendant] had notice that it was receiving trust assets."); *I-T-E Imperial Corp.-Empire Div. v. Bankers Tr. Co.*, 51 N.Y.2d 811, 814 (1980) (affirming grant of summary judgment to defendant transferee because plaintiffs had adduced no evidence that "there is a triable issue concerning Bankers Trust's status as a purchaser in good faith for value"); *Fleck v. Perla*, 40 A.D.2d 1069, 1070 (4th Dep't 1972) ("*If the plaintiff can prove* that the defendant

received property knowing it to have been the subject of a trust and to have been transferred in violation of the trustee's duty or power, defendant would be liable to the plaintiff for his conversion of the trust assets." (citation omitted)); *see also LeChase*, 6 N.Y.3d at 289 (noting that court below had "determined that [plaintiff] failed to establish [defendant's] actual knowledge; and that [defendant] was therefore entitled to judgment as a matter of law," but reversing on ground that plaintiff had shown such knowledge).[13]

That fits the most natural reading of the statutes at issue. The provision establishing a cause of action against trust recipients embeds this knowledge requirement. *See* N.Y. Lien Law § 77(3)(a)(vi) ("Action to Enforce Trust"). Another provision of Article 3-A clarifies that "[n]othing in this article *affects the rights* of a holder in due course of a negotiable instrument or of a purchaser in good faith for value *and without notice that a transfer to him is a diversion of trust assets*." *Id.* § 72(1). Neither provision presents lack of knowledge as an affirmative defense; instead, each suggests that knowledge or notice is a necessary element of a plaintiff's claim to recover against a recipient of trust funds. That suggestion is reinforced by Article 3-A's separate devotion of an entire section to establishing an "*[a]ffirmative defense* in action against transferee of trust assets." *See* N.Y. Lien Law § 73 (emphasis added) (permitting a defendant to show "by way of defense" that it had filed a "notice of lending" and was therefore entitled to knowingly receive trust assets, despite not being a beneficiary). That Article 3-A speaks so clearly to the establishment of an affirmative defense in this context cuts strongly against TPBC's contention that its authors tacitly intended lack knowledge also to be an affirmative defense.

---

[13] TPBC identifies some cases referring to lack of knowledge as a "defense," but those cases do so in passing and without opining on the allocation of burdens of pleading or proof.

Thus, Article 3-A requires that TPBC plead the lender transferees' knowledge that the funds they received were part of a trust. The SAC fails to do so. That failure is striking given that it *does* includes direct allegations of other defendants' actual or constructive knowledge. *See, e.g.*, SAC ¶¶ 79 (Developer Affiliates "knew or should have known that the funds received by the Developer from the Port Authority and the Lender Defendants were to be used to pay for the construction work on the Project"), 112 (alleging that unlawful "distributions were done by the Individual Owners with knowledge" that the funds were meant for TPBC), 124 (similar).

The SAC further fails to allege facts on which a court could plausibly infer such knowledge. To the contrary, it specifically identifies another source of revenue that just as likely could have funded the Developer's transfers to the Lenders, without dipping into the Article 3-A trust: rental income. It pleads that the Developer received "rental payments from sublessees of the" Property during the Project, and that, on at least one occasion, it used those funds to pay its lenders. *See id.* ¶¶ 34, 63. The SAC does not plead any facts supporting the conclusion that the Lender Defendants, upon receiving funds from the Developer, actually or should have understood those payments to have illicitly come from a trust fund designated for the benefit of TPBC and other beneficiaries, rather than this alternative, and permissible, source of funding. Nor does the SAC plead any facts suggesting that the Lender Defendants knew or should have known of the Developer's financial distress, or that it was failing, or at risk of failing, to make payments to its subcontractors, like TPBC, so as to raise suspicions about the Developer's ability lawfully to pay off its debts to them. In fact, with limited exceptions, the SAC does not plead any facts about specific transactions with the Lender Defendants, including when they took place and whether they occurred during the period in which the Developer was still making its payments to TPBC.

In a footnote, TPBC counters that, even if it bore the burden of pleading knowledge, it sufficiently pled constructive knowledge because the lenders knew that the "Developer was engaged in the construction" business, and that such knowledge suffices to plead that transferees are liable under the Lien Law. *See* Pl. Lender Opp'n at 13 n.7. But the SAC's pleading that the Developer had paid the Lender Defendants with "net rental income," SAC ¶ 63, which does not constitute trust assets, sets it apart from the cases it cites. In *LeChase*, on which TPBC largely relies, the transferee was a factoring bank, which had advanced money to a contractor for a specific project, in exchange for the contractors' assignment to the bank of its accounts receivable associated with that project. 6 N.Y.3d at 292–93. Pursuant to that assignment, the owner sent funds that otherwise would have gone to the contractor to the bank, which had received the specific contracts to which those funds were tied. *Id.* The plaintiff, a subcontractor, sued the bank, seeking recovery of the assigned amounts, after the contractor failed to pay it. *Id.* The Court of Appeals held that, given the bank's receipt of construction invoices in its role as a factor, the bank should have known that the money it was receiving was subject to Article 3-A. *Id.* Once it was established that the relevant contracts and invoices were for construction, the amounts paid by the owner to the contractor were inevitably a part of a Lien Law trust. Here, on the other hand, the SAC pleads a viable alternative source of funding, and sparse facts about the circumstances of any transfers. On the pleadings, there is simply no basis on which to infer similar knowledge by the Lender Defendants.

Accordingly, TPBC's Lien Law claim against the Lender Defendants is dismissed.[14]

---

[14] Given this decision, the Court does not have occasion to address the Lender Defendants' separate argument that the SAC does not plausibly allege that they received any trust assets in the first place.

### C.     Declaratory Judgment Claim

The SAC also seeks a declaratory judgment, solely against the Lender Defendants.  *See*

SAC ¶¶ 86–94.  In Count Two, TPBC alleges that, under section 14A.10 the Ground Lease, any

mortgages on the Property—such as those held by the Lender Defendants—were subordinated to

the Ground Lease.  *See id.* ¶ 88.[15]  It also alleges that the Ground Lease provides, in section 5.7,

that the Developer "shall pay all claims lawfully made against it by its contractors, subcontractors,

materialmen and workmen," which include TPBC.  *Id.* ¶ 90.  Taken together, TPBC claims that

section 5.7 and 14A.10 make it "an intended third-party beneficiary of the Ground Lease," the

effect of which is to "subordinate[] the liens and claims of the Lenders to the liens and claims

held by . . . TPBC."  *Id.* ¶ 94.  It seeks a declaration to this effect.

In their briefs, the parties did not focus on the merits of this claim, but contested whether

the Court should, in its discretion, address it.  The Lender Defendants argued for abstention,

noting that the bankruptcy court presiding over the Developer's bankruptcy is simultaneously

considering the same issue, and forecasting that it would likely issue a decision on it soon.  *See*

Lenders Mem. at 16–18 (citing *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir.

2003) (discussing factors that should guide a court's "discretion to determine whether it will

exert jurisdiction over a proposed declaratory action or not")).  TPBC challenged the

applicability of *Dow Jones*, argued that abstention is merited only in exceptional circumstances

in a case bringing both declaratory and other claims, and contended that such circumstances are

not present here because, it projected, the bankruptcy court would not address the same issues as

presented here.  *See* Pl. Lender Opp'n at 17–20 (citing *Colo. River Water Conservation Dist. v.*

*United States*, 424 U.S. 800, 813 (1976)).

---

[15] The Ground Lease was not attached to any pleadings or motion papers.  The Court relies on
the synopses provided in the SAC.

Since the parties completed their briefing, however, the bankruptcy case has progressed. On July 14, 2020, the bankruptcy court issued a bench ruling addressing—contrary to TPBC's forecast—precisely the question presented by its claim for a declaratory judgment. *See* Bankr. Order; Bankr. Tr. at 65–81.[16]  It held, after a thorough discussion, that "Tutor Perini is not a third-party beneficiary of the ground lease and cannot otherwise assert a cure claim on account of the ground lease."  Bankr. Tr. at 80.  It found, broadly, that there is no evidence that the parties to the Ground Lease had intended the contract to benefit TPBC.  Specifically, it found that section 5.7(c), the provision cited in the SAC, did not show such intent.  *Id.* at 74–75. Rather, it held, TPBC is simply an unsecured creditor of the Developer.  *Id.* at 52.  Finally, it held that the ruling permitted TPBC to keep pursuing its claims in other forums—including in this case—but only to the extent that its claims in those proceedings were "not inconsistent with the Court's ruling here today."  *Id.* at 52, 80–81.  On August 12, 2020, the bankruptcy court issued a written order memorializing the same.  Bankr. Order at 5 ("(a) Tutor Perini is not a third-party beneficiary of the Ground Lease and (b) Tutor Perini has no right to assert a cure claim pursuant to Section 365 of the Bankruptcy Code."); *id.* (TPBC may pursue claims against lenders and "other non-Debtor third parties, including current or former officers of the Debtor," but only "to the extent those claims and causes of action are not inconsistent with this Court's Order.").  On August 13, 2020, defendants notified this Court of the bankruptcy court's decision. Dkt. 99.  TPBC has not responded, or sought leave to do so.  It has since appealed the bankruptcy court order, and that appeal remains pending in this District.  *See* No. 20 Civ. 7433 (JSR), Dkt. 1.

---

[16] These decisions are available at *In re George Wash. Bridge Bus Station Dev. Venture, LLC*, No. 19-13196 (SCC), Dkt. 361 (Bankr. S.D.N.Y. Aug. 12, 2020).

The Court will dismiss Count Two of the SAC, without prejudice, in light of the bankruptcy court's decision on this issue.  Under New York law,[17] the doctrine of collateral estoppel, or issue preclusion, "bars a party from relitigating in a subsequent proceeding an issue clearly raised in a prior proceeding and decided against that party where the party to be precluded had a full and fair opportunity to contest the prior determination."  *Buford v. Coombe*, 199 F.3d 1321 (2d Cir. 1999) (quoting *Weiss v. Manfredi*, 83 N.Y.2d 974, 976 (1994)).  It bars a re-litigation of an issue if: "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding."  *McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir. 2007) (quoting *Vargas v. City of New York*, 377 F.3d 200, 205–06 (2d Cir. 2004)).[18]

---

[17] "The law governing the doctrine of *res judicata* in a diversity action is 'the law that would be applied by state courts in the State in which the federal diversity court sits.'"  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 195 (2d Cir. 2010) (quoting *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001)); *see Schlaifer Nance & Co. v. Est. of Warhol*, 764 F. Supp. 43, 45 (S.D.N.Y. 1991) ("It generally has been held that state law controls the application of the doctrines of *res judicata* and collateral estoppel in a diversity action in federal court where the issues involved in the prior judgment required the application of State law."). *But see Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 41–42 (2d Cir. 1986) (courts "must apply federal law to determine the preclusive effect of a prior *federal question* judgment" (emphasis added)).  The bankruptcy decision here applied state law, but did not arise under diversity jurisdiction, so there is a question as to the source of law to apply to it.  Because the substantive law governing both the issue before the bankruptcy court and the issue pending here is New York state law, the Court's view is that the cases cited above—*Duane Reade*, *Semtek*, and *Schlaifer Nance & Co.*—provide the rule of decision, and New York law applies.  In any event, because "there is no discernible difference between federal and New York law concerning res judicata and collateral estoppel," the outcome would be the same under either framework. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

[18] Separately, the doctrine of res judicata, or claim preclusion, will bar a claim related to a prior action where "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014) (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.2d 275, 285 (2d Cir. 2000)).  Here, the bankruptcy decision was rendered in the course

Both criteria are met here.  The central issue presented by TPBC's declaratory claim is whether, *because* TPBC is a third-party beneficiary under section 5.7 of the Ground Lease, section 14A.10 of that contract subordinated the Lender Defendants' rights to payment to its own.  *See* SAC ¶¶ 86–94.  The bankruptcy court resolved that issue and decisively rejected that TPBC is a third-party beneficiary.  *See* Bankr. Tr. at 68, 72 ("Tutor Perini is not a third-party beneficiary of the ground lease. . . .  The plain language of the ground lease does not evidence any intent to benefit Tutor Perini," despite "explicitly grant[ing] third-party beneficiary status to the [Developer's] subtenants.").  That neutralizes the major premise of TPBC's claim for declaratory relief.  *See* SAC ¶ 94 *("Because* TPBC is an intended third-party beneficiary of the Ground Lease, TPBC is entitled to the benefits of section 14A.10 of the Ground Lease, which subordinates the liens and claims of the Lenders to the liens and claims held by . . . TPBC." (emphasis added)).  The bankruptcy court therefore actually and necessarily decided the issue against TPBC.

Nor is there any question that TPBC had a full and fair opportunity to litigate the issue before the bankruptcy court.  That court chronicled the exhaustiveness of the parties' litigation over the question.  Bankr. Tr. at 26–27 (the court: "I want this record to be crystal clear that if this does not go in favor of Tutor Perini, I will not see on appeal the suggestion . . . that the issues were not appropriately before the court, et cetera.  So I would like . . . your

---

of approving a settlement agreement between several parties to that proceeding.  It thus appears doubtful whether its ruling as to TPBC's priority and third-party-beneficiary status constitutes an "adjudication on the merits," sufficient to preclude all claims arising out of that proceeding.  *See In re Delta Air Lines, Inc.*, 374 B.R. 516, 526 (S.D.N.Y. 2007) ("[T]the matter before the Bankruptcy Court was a motion pursuant to Bankruptcy Rule 9019 to approve a Settlement, not an adjudication on the merits of individual tort or contract claims . . . .").  In all other aspects, however, TPBC's claim would appear also to be barred by *res judicata*.

representation that none of that will occur."  TPBC's counsel: "It will not, Your Honor.").  After

informing TPBC's counsel that "[t]his is fish-or-cut-bait time," and that "[i]f you don't believe

this hearing has been adequately noticed and fully briefed on the issues of whether Tutor Perini

is a third-party beneficiary . . . , you need to tell me very clearly," TPBC's counsel agreed that

the issues were ripe for adjudication, and that "[e]verybody's briefed them to death."  Bankr. Tr.

at 25–26; *see id.* at 27 (TPBC: "Tutor Perini certainly believes and has set forth in its briefs, and

we've done this about three times now, so I'm not going to repeat and cite case law that's all

in . . . the papers about third-party beneficiary status . . . .").

Accordingly, TPBC's claim that it is a third-party beneficiary of the Ground Lease, and

its declaratory judgment claim that depends on that proposition, are precluded.  *See Metromedia

Co. v. Fugazy*, 983 F.2d 350, 366 (2d Cir. 1992) (issue precluded where "the Bankruptcy Court

Decision meets all of the requirements for collateral estoppel"), *abrogated on other grounds as

recognized by Yung v. Lee*, 432 F.3d 142, 147–48 (2d Cir. 2005); *Falbaum v. Pomerantz*,

19 F. App'x 10, 12 (2d Cir. 2001) ("The Bankruptcy Court conclusively determined several

issues that are determinative in the current action," such that "collateral estoppel bar[red] the

plaintiffs' current claim[.]"); *cf. Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 89

(2d Cir. 1997) (proper way to challenge bankruptcy court's decision is through appeal, not

collateral proceeding, even where bankruptcy court arguably lacked subject-matter jurisdiction).

That is so even though TPBC has appealed this aspect of the bankruptcy court's order.  *See

Metromedia*, 983 F.2d at 367 ("The fact that the appeal of that matter from the district court to

this Court is being dismissed for lack of appellate jurisdiction does not mean that the bankruptcy

court's decision was not sufficiently final for purposes of collateral estoppel.").  Given that

appeal, however, the Court will dismiss this claim without prejudice to TPBC's ability to reassert it should the decision of the bankruptcy court be overturned.[19]

### D.    Conversion Claim

TPBC also brings a claim for common law conversion, solely against the Developer Affiliates, who move to dismiss that claim under Rule 12(b)(6).  The Court denies that motion.

Under New York law, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49 (2006); *see Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403 (2d Cir. 2006).  "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito*, 8 N.Y. 3d at 49 (citation omitted).

The Developer Affiliates argue that TPBC's conversion claim fails for two reasons.  Both are easily put aside.  First, they reprise their argument that TPBC has not alleged possessory rights or an interest in the putative trust funds, because it has not established an Article 3-A trust, or that it is a beneficiary of such trust.  For the reasons above, that is wrong.

Second, they argue that TPBC's conversion claim duplicates its extant breach-of-contract claim, asserted in the arbitration but stayed pending the Developer's bankruptcy.  But a conversion claim is not duplicative of a contract claim where a plaintiff alleges "acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual rights." *Rolls-Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117, 124 (S.D.N.Y. 1996) (citation omitted).  For example, where a complaint alleges that defendants not only failed to deposit

---

[19] In that event, the Court would expect the Lender Defendants to maintain their position that the outcome of the bankruptcy proceeding is dispositive here.

funds in the proper account as required by a contract, "but also that defendants took the separate, additional step of arranging for the Funds to be directed into their possession," the claims are not duplicative. *R.B. Dev., Co. v. Tutis Cap. LLC*, No. 12 Civ. 1460 (CBA), 2013 WL 12358006, at *19 (E.D.N.Y. Sept. 27, 2013); *see Fabry's S.R.L. v. IFT Int'l, Inc.*, No. 02 Civ. 9855 (SAS), 2003 WL 21203405, at *4 (S.D.N.Y. May 21, 2003) (Defendants' "continued retention of the payments collected from plaintiff's customers without authorization and in defiance of plaintiff's superior right of ownership is sufficient to establish conversion as an action distinct from any breach of contract claim."). Here, the SAC alleges wrongful acts beyond the nonpayment of amounts owed under a contract. Those include the diversion of specific funds received by the Developer and owed to TPBC, which formed part of a trust fund by operation of the Lien Law, and which the Developer instead used to pay its principals, as well as its legal fees and other extraneous expenses. *See* SAC ¶ 79. That makes TPBC's conversion claim non-duplicative.

### E.  Constructive-Fraud Claim

Last, TPBC alleges constructive fraud, again only against the Developer Affiliates. Its basis for this claim is that, during the attachment proceedings before the arbitral panel, the Developer, through its owners and counsel, misrepresented that (1) it did not intend to declare bankruptcy; and (2) TPBC was not at risk of nonpayment, should it prevail, and so there was no basis for an injunction or attachment. *See id.* ¶¶ 48, 119–20. In reliance on these statements, TPBC alleges, it declined to pursue additional legal action that might have prevented the Developer's dissipation of the assets TPBC had previously sought to attach.

Under New York law, there are five elements of fraud: "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997). "Constructive fraud

48

requires establishing the same elements as actual fraud, 'except that the element of scienter is replaced by a fiduciary or confidential relationship between the parties.'" *E\*TRADE Fin. Corp. v. Deutsche Bank AG*, 631 F. Supp. 2d 313, 387 (S.D.N.Y. 2009) (quoting *Apace Commc'ns, Ltd. v. Burke*, 522 F. Supp. 2d 509, 519 (W.D.N.Y. 2007), *aff'd*, 374 F. App'x 119 (2d Cir. 2010)); *see LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 524 (S.D.N.Y. 2014).  Under Federal Rule of Civil Procedure 9(b), each element of TPBC's fraud claim must be alleged with specificity.[20]  To do so, TPBC must: "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004).

---

[20] TPBC argues that Rule 9(b) does not apply because some courts have applied the less demanding Rule 8 standard to claims for constructive, rather than actual, fraud.  That does not avail TPBC here, however.  The apparent inconsistency in the case law arises from New York law's terming of two distinct torts "constructive fraud."  The first, outlined above, comprises largely the same elements as actual fraud, and so courts generally assess it under Rule 9(b)'s rubric.  *See, e.g.*, *Spinnato v. Unity of Omaha Life Ins. Co.*, 322 F. Supp. 3d 377, 404 (E.D.N.Y. 2018) ("Courts in the Second Circuit have traditionally applied Rule 9(b) to constructive fraud as it closely resembles the legal elements of a fraud claim."); *Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 397 n.75 (S.D.N.Y. 2010); *Burrell v. State Farm & Cas. Co.*, 226 F. Supp. 2d 427, 438–39 (S.D.N.Y. 2002).  The second, however, arises under New York Debtor and Creditor Law § 273, concerning "fraudulent conveyances," which does not require "*any* of the traditional elements of fraud."  *Sullivan v. Kodsi*, 373 F. Supp. 2d 302, 307 (S.D.N.Y. 2005) (emphasis added); *see, e.g.*, *Priestly v. Panmedix Inc.*, 18 F. Supp. 3d 486, 497 (S.D.N.Y. 2014) ("[A] conveyance by a debtor is deemed constructively fraudulent under DCL § 273–a if (1) it is made without fair consideration; (2) the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him; and (3) after final judgment for the plaintiff, the defendant fails to satisfy the judgment." (citation omitted)).  Thus, in the § 273 context, "despite the statutory label" of "fraud," courts have not held plaintiffs to the Rule 9(b) standard.  *Sullivan*, 373 F. Supp. 2d at 307; *see Priestly*, 18 F. Supp. 3d at 497.  Here, however, TPBC proceeds under the former theory of constructive fraud, and so Rule 9(b) applies.

The Court finds most of the Developer Affiliates' arguments on this point to be unconvincing. But TPBC's claim for constructive fraud must still be dismissed. That is because the SAC fails to identify the speaker of any alleged misrepresentation. "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *see Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 248 (S.D.N.Y. 2006) ("Where fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts complained of by each defendant." (quoting *Ellison v. Am. Image Motor Co.*, 36 F. Supp. 2d 628, 641–42 (S.D.N.Y.1999))).

Here, the SAC alleges only that the Developer, which is not a party, and the "Individual Owners" (*i.e.*, Garchik, McBride, and Slayton) made the above representations. *See* SAC ¶¶ 48, 119–20. Yet, in shotgun fashion, it names in this count not only each of those owners, but also entities allegedly controlled by those individuals, an employee of one of those entities, and 300 Doe defendants. *See id.* Count IV. Such inartful, group pleading exemplifies why Rule 9(b) exists. *See generally Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (Rule 9(b) furthers, among others, the interest in giving specific defendants notice of the actual claims against them and safeguarding their reputation from improvident charges of wrongdoing). Not only is it unclear from the SAC which of Garchik, McBride, and Slayton—if any—made the alleged misrepresentation. The SAC also does not provide any basis to attribute these statements to the many other defendants named in this count who are not alleged even to have participated in doing so. Rule 9(b) is "not satisfied by a complaint in which defendants are clumped together in vague allegations." *Ellison*, 36 F. Supp. 2d at 640 (citation omitted). Accordingly, the Court dismisses TPBC's claim for constructive fraud.

### F.     Dismissal with Prejudice

Except for TPBC's declaratory judgment claim, which, for the reasons above, is dismissed without prejudice, the Court dismisses those of TPBC's claims that it dismisses with prejudice and without leave to amend.  TPBC has already had the opportunity twice to amend its Complaint, including once after all four sets of defendants had filed four motions to dismiss.  *See* Dkts. 63–70.  After those motions were filed, the Court gave TPBC the choice either to oppose those motions or to amend the FAC to fortify its claims, and notified TPBC that this was its final opportunity to amend.  *See* Dkt. 72.  TPBC chose to amend, but has again failed to sufficiently plead its Lien Law claim against the Lender Defendants or constructive-fraud claim against the Developer Affiliates.  For its constructive-fraud claim, it amended after the Developer Affiliates raised the very argument that has now proven fatal to that claim.  *See* Dkt. 66 at 21–22.  As to its Lien Law claims against the Lender Developers, it appears that, where TPBC could plausibly allege knowledge, it did so.  *See, e.g.*, SAC ¶¶ 79, 112, 124.  And TPBC has not sought leave to amend or stated that it is aware of unpled facts that could salvage that aspect of its claim.  So, as to those claims—TPBC's Lien Law claims against the Lender Defendants and its constructive-fraud claim against the Developer Affiliates—the Court dismisses them with prejudice.  *See TechnoMarine*, 758 F.3d at 506 (upholding dismissal of amended complaint with prejudice where, "following Defendant's first motion to dismiss for failure to state a claim," plaintiff had already amended its complaint once and failed to "resolve its pleading deficiencies in its First Amended Complaint"); *Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP*, 351 F. App'x 472, 474 (2d Cir. 2009) (summary order) (district court did not abuse discretion by dismissing with prejudice where plaintiff "did not move for leave to replead in opposition to [defendant's] motion to dismiss his original complaint with prejudice").

## CONCLUSION

For the reasons above, the Court, at the outset, grants TPBC's motion to drop DVCI as a party, preserving the Court's diversity jurisdiction.

The Court grants the motions to dismiss filed by the Senior Lenders, the Co-Lenders, and UMEZ.  That dismissal is with prejudice as to TPBC's claim against those defendants under the Lien Law.  As to TPBC's request for declaratory relief against the same defendants, the Court's dismissal is without prejudice to TPBC's right to pursue that claim anew should the bankruptcy court's decision be overturned, so as to deprive that decision of collateral-estoppel effect.

The Court also grants in part, and denies in part, the motion to dismiss by the Developer Affiliates.  The Court grants that motion as to TPBC's claim for constructive fraud, which is dismissed with prejudice.  In all other respects, the Court denies that motion.

The Clerk of Court is respectfully directed to terminate the following parties from this action:  New York City Regional Center, LLC; George Washington Bridge Bus Station and Infrastructure Development Fund, LLC; GSNMF SUB-CDE 12 LLC; GSB NMTC Investor LLC; LIIF SUB-CDE XXVI, LLC; DVCI CDE XIII, LLC; GWB NMTC Investment Fund LLC; GWB Leverage Lender, LLC; George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC; and Upper Manhattan Empowerment Zone Development Corporation.

The Clerk of Court is further directed to terminate the motions pending at dockets 63, 65, 67, 68, 69, 74, 76, 78, 80, and 108.

A separate order scheduling an initial pretrial conference will issue soon.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: March 15, 2021
      New York, New York